# MAY 22, 1946

ROY BABIN V. THE STATE.

No. 23324. Delivered April 10, 1946.
Rehearing Denied May 22, 1946.

The opinion states the case.

*W. J. Baldwin,* of Beaumont, *R. E. Biggs,* of Liberty, and *Henry E. Kahn* and *Spurgeon E. Bell,* both of Houston, for appellant.

*Ernest S. Goens,* State's Attorney, of Austin, for the State.

GRAVES, Judge.

Appellant was charged with the malicious killing of Earl Martin, and upon his conviction, was assessed a penalty of twenty-five years, and he appeals.

There is but slight difference between the appellant's and the state's testimony. It being shown that on the night of July 18th, 1945, appellant borrowed a pistol from a friend, agreeing to return same by 11:00 o'clock that night; that he repaired to a gambling house, some few miles from the City of Liberty, arriving there soon after 10 o'clock, and began drinking and gambling; that he continued such conduct until about 4 o'clock in the morning of the 19th of July, at which time, he left the gambling hall and went out to his car, parked nearby, and possessing himself of this borrowed pistol, he returned to the hall, and presenting the pistol, demanded of one J. D. Lee the return of some $600.00, supposedly won from appellant by Lee at a time and place different from this hall where the shooting soon thereafter took place. Appellant had been gambling at this particular hall some the night of the killing, but the trouble that culminated in the death of Earl Martin, was caused by a prior game where, in another night of gambling, Lee had won about $400.00 from appellant, and about $230.00 from one Ste-

gall. Appellant's contention being that he was cheated out of this money, and he produced his pistol, intending to bluff J. D Lee and make his return same to him. Upon presentation of this pistol on the night of the killing Mr. Martin, who was running this place, interceded, and came between Lee and appellant and tried to persuade him to put up the pistol, finally agreeing to give appellant a check for this money lost in the prior game, which was played in the City Hall and not in this gambling house, but appellant refused to take Martin's check in payment of his claim against Lee.

He asked Lee for his money and when Lee denied owing him anything, he said "I am not playing with you, I am going to kill you." Martin said, "Lay down that gun, Roy. I will write you a check for that amount. Let's don't have any trouble out here, I don't want any trouble out here." However, appellant refused to accept the check, demanding money. Appellant then said: "If anybody goes out that door, I am going to shoot them, and I am a good shot." When Martin was shot, he was holding up his hands and asking appellant to put down the gun, according to the State's witnesses, and no one had hold of appellant when he fired the fatal shot. A State's witness testified:

"When the gun was fired, it was in Roy's hand, pointed towards Earl Martin. I say he shot Earl Martin with this gun and that he pointed it at him and shot him. He hit him in the head there (witness points to his own head) and went up through the top of his head. He pointed it straight at Earl Martin then and he took deliberate aim at Earl Martin. The gun was right on Earl Martin. It was not right up against his cheek. He was back off a good piece from him. I don't know how far but I would say three feet, anyway. He was trying to get Earl Martin out of the way and had the gun on Earl Martin all the time. He had the gun pointing right in Earl's face, right on Earl, when he shot him. I don't know whether it was on his face, or not, but it was right on Earl Martin.

"He said, 'I am going to shoot you if you don't get out of the way.' He did have the gun right on Earl Martin and pointed it right at him and told him if he didn't get out of the way, he was going to kill him. He did kill him."

A further witness testified: "He (appellant) told Mr. Martin that 'If you don't get out of the way, Martin, I am going to shoot you.' I think he repeated that several times, trying to get Martin away from him. He told Martin he didn't want to hurt

him, to get out of the way. Martin was trying to keep down trouble, and thought he would argue the boy out of it * * * at the time immediately preceding and before Mr. Martin was shot, when Martin was pleading with the defendant not to shoot Lee, the defendant kept telling Martin to get out of the way, saying: 'If you don't get out of the way, Martin, I am going to shoot you.' "

All of the State's witnesses who saw the shooting, show Martin as standing before appellant asking him not to shoot, and no one touching appellant at such time.

Appellant's testimony shows that sometime prior to this killing he had engaged in an all night gambling game with one J. D. Lee and others and he had lost $400.00 therein. That he had decided that Lee had cheated him in the game and he decided to make Lee refund that money. That he was drinking, and after borrowing a pistol, at about ten o'clock on the night of the tragedy he appeared at this gambling house and continuted to drink. About four o'clock in the morning he decided to pull a bluff on J. D. Lee and make him give him the money back that was lost in the previous game. He pulled his gun and demanded of Lee his money, and Mr. Martin told him that they did not want any trouble in there, and refused to let appellant and Lee go outside and settle this matter. While appellant was holding this gun in his hand someone rushed him, and one of them grabbed his hand and he lost his watch. Then he did not know what happened. The gun fired, and he could not tell what happened. He did not point the pistol at anybody and did not intend to shoot anybody, neither Lee nor anyone else. He considered Mr. Martin his friend, and was affected mentally and physically because of his death. He was drunk, so drunk he couldn't remember, he did not know whether he shot Martin or not, he was not pointing his gun at anyone, he was holding the gun up, for the purpose of making Lee pay him that money. He was putting on a bluff, and thought he was shooting the gun up in the air to run a bluff. He didn't see Mr. Martin when he pulled the trigger, as they were all standing right around him.

Bill of Exceptions No. 1 complains because the trial court refused to allow appellant to prove by J. D. Lee a certain transaction with one Paul Blanchette wherein, in a gambling game between Lee and Blanchette at some time prior to this killing herein inquired about, Blanchette lost some One Thousand Dollars, and afterwards came to Lee and producing a pistol de-

manded the return of such money, and Lee "refunded this money on the grounds that he had been cheated out of that money." This offered testimony was objected to by the State, and not allowed by the Judge trying the case. We cannot see the materiality of such testimony; it doubtless might have shown the termity of Mr. Lee, and the probability of his returning some money at the point of a pistol, but we think such a characteristic upon his part, could not operate as an excuse, or an extenuation of guilt upon the part of appellant. True it is, appellant testified that he intended to bluff Lee, but the fact that Lee had previously been bluffed by another, does not seem to us to make plausible the fact that he would again succumb to a further bluff.

This above holding should also dispose of Bill No. 2, which relates to the refusal of the trial court to allow appellant to detail a conversation had with Paul Blanchette, wherein Blanchette outlined the procedure relative to Blanchette's recovery of $1,000.00 won from him by J. D. Lee. This was undoubtedly hearsay and was properly excluded by the court.

Bill No. 3 relates to acts upon the part of Mrs. Earl Martin, the wife of the deceased, wherein it was sought to show that in making out a life insurance claim regarding the death of her husband, wherein there was a double indemnity provided for in the event of an accidental death, she stated that the death of Earl Martin was accidental. We think the statement itself evidences its objectionable character.

Bill of Exception No. 5 relates to alleged misconduct of the jury in that it is claimed that Wade B. Colbert, foreman of the jury, on his voir dire examination, withheld information from appellant's attorneys relative to his acquaintanceship with Earl Martin, the deceased, in that the juror when questioned relative to whether or not he knew the deceased, answered that he only knew him when he saw him; whereas it was shown that he and the deceased lived in the same block in the City of Liberty and were neighbors. In answer on the motion for a new trial, the juror stated that he had never spoken to the deceased but once, when he introduced himself to Martin and told him that the Baptist preacher had asked him, the juror, to invite Martin to come to Sunday School, and that was his only contact with the deceased. It is not claimed nor contended that the juror intentionally deceived appellant's attorneys, but it seems that they were content with the answer that the juror only knew Mr.

Martin when he saw him; there is no further association shown between the two; it was shown that the juror kept an hotel, and for some five or six months, Mr. Martin had lived in the same block with this hotel. In the town of Liberty, a place of about 3,000 people, it should have been easy to ascertain the residence of any one, as well as the residence of the deceased, and we do not think the answer by the juror, that he only knew the deceased when he saw him, was so misleading as to conceal from appellant's attorneys the fact that deceased lived in the same block with the juror.

Bill of Exception No. 5-a relates to the claimed misconduct of the jury, in that it is claimed that the same juror, Colbert, gave testimony in the jury room while they were deliberating upon their verdict relative to the amount of punishment to be assessed, in that such juror said that "Mr. Martin (deceased) had the reputation of being a good man around Liberty." It is shown that Mr. Martin's reputation had not been placed in issue during the trial. It is shown in such bill that the jury soon agreed on a verdict of guilt and one juror, Jess O'Neal, testified that while discussing the amount of punishment to be assessed against appellant some were for 99 years, some for 25 years, one for 20 years, and one for 10 years, and while endeavoring to harmonize these different views, the following conversation took place between Colbert and O'Neal: "He (Colbert) says 'Jess, I believe 99 years is not too much.' I said, 'Well, I am not in favor of it.' I says, 'I think 25 is plenty.' And he says, 'Well, you would change, wouldn't you?' I said 'No, I don't think.' He said 'Well, Mr. Martin had a reputation of being a good man around Liberty.' That is all that was mentioned about Mr. Martin's name in the jury room in my presence that I heard. All the rest of the jury were there, all sitting around the table, and discussing among themselves. If they would have been paying attention, they could practically every man, I suppose, have heard this discussion between Mr. Colbert and me. Me and him was kind of talking there confidential. All the jurors could have heard that discussion. I don't know whether they did, but they could have. Some of the jurors, a couple of them, discussed a term of less than 25 years. I believe Mr. Silvers suggested 20 years. He thought 25 was too much. There was one wanted 10 but I don't recall who he was."

Mr. Colbert, when placed on the stand, among other things, testified: "I was selected as foreman of the jury. At no time in the jury room did I make the remark that I thought 99 years

was little enough for a man who had killed a man like Earl Martin, who had a good reputation here in Liberty."

The remaining ten jurors were not placed upon the stand at the hearing of the motion for a new trial, and we thus have one juror asserting that the foreman made the statement about the deceased, and the foreman himself denying that he made such statement. The careful trial court evidently decided this conflict between the testimony of these two jurors in favor of Mr. Colbert's denial. He saw the jurors and was in a better position to decide this matter than is this court, who sees neither, and we do not feel justified in setting his conclusion aside, and substituting one of our own.

Bill of Exception No. 6 relates to a failure of the trial court to give in the charge to the jury the law of negligent homicide in the second degree, a prepared charge relative thereto having been presented by appellant's attorneys, and by the court refused. There is found testimony in the record that appellant was engaged in the performance of an unlawful act, that is rudely displaying a pistol, and it is claimed that in such display, the pistol was accidentally discharged and killed Mr. Martin, appellant testifying: "Then I just dont know exactly what happened. The gun fired. I heard that. And I just couldn't tell you what happened. You know it was all done so quick there. I was greatly stunned and all and scared. * * * I was holding that pistol up this way (demonstrating) when it went off. I don't remember where Mr. Martin was standing exactly. I wanted to go out there and put on a bluff and try to collect that money. I thought I was shooting the gun up in the air to run a bluff. I didn't see Mr. Martin when I pulled the trigger as they was all standing right around me there."

While it is true that the rude display of a deadly weapon is a misdemeanor, and negligent homicide of the second degree could be based upon a homicide committed by means of such a display, Art. 1239 P. C., there seems to be other and further matters connected with such a display; one of them being the putting one in fear of his life and taking from him a sum of money, such being a felony, and therefore not the basis of a charge on negligent homicide, such unlawful act of a necessity having to be a misdemeanor, Art. 1240 P. C. If appellant's contentions were sound, in all homicides wherein an unlawfully carried pistol was exhibited, there would be of necessity called for a charge on negligent homicide of the second degree. It is

again observed that the action of making an assault with a pistol unlawfully carried comes within the defintion of the felony statute of an assault with a prohibited weapon, Art. 1151 P. C.

Again it is believed that in a trial court's charge to acquit appellant unless the jury believed beyond a reasonable doubt that the pistol was not fired accidentally, was met and charged upon in appellant's theory of this unfortunate occurrence. And unless the jury had disbelieved appellant's statement, they would doubtless have acquitted him.

Under the circumstances here presented, we think the trial court was correct in refusing the charge on negligent homicide in the second degree.

We express the opinion that no error is shown herein, and the judgment is therefore affirmed.

ON APPELLANT'S MOTION FOR REHEARING.

DAVIDSON, Judge.

Appellant presses upon us that the juror Colbert was shown to be so unfair and partial as to require a reversal of the judgment and that we erred in reaching a contrary conclusion.

We do not have here a case where the juror, upon his voir dire examination, testified falsely to questions propounded, whereby appellant and his counsel were misled. Nor does the appellant contend that the juror intentionally deceived him. To the contrary, appellant's complaint is that the juror did not volunteer all the information touching his acquaintance and relations with the deceased and that, by reason thereof, his bias and unfairness as a juror were shown.

The answer of the juror that he "knew him (the deceased) when I *seen him*," was sufficient to place appellant upon notice that there was an acquaintance existing between the prospective juror and the deceased. If appellant desired to know the extent of that acquaintance, he should have inquired of the juror.

Every fact which the appellant ascertained after conviction relative to the acquaintance and relations between the juror and the deceased could have been ascertained by questioning the juror at the time of the voir dire examination. That it was not

348

developed was because appellant did not interrogate the juror relative thereto.

To agree with appellant's contention would be to hold that the mere failure of a prospective juror to volunteer full information as to his prior acquaintance and relations with the deceased in a murder case, stamps such a juror as unfair. This we are unwilling to do. See Lera v. State, 144 Tex. Cr. R. 619, 165 S. W. (2d) 92.

Appellant insists that he was entitled to a charge on negligent homicide and that we erred in failing to so hold.

According to the State's testimony, the shooting by appellant was deliberate. According to the defense, the shooting— that is, the firing of the gun—was accidental. Under such facts, the full charge on accidental shooting protected appellant in his rights. Negligent homicide is deemed not raised. Combs v. State, 52 Tex. Cr. R. 613, 108 S. W. 649.

We have again examined the record in view of appellant's insistence and remain convinced that reversible error is not reflected. It would serve no useful purpose to write further thereon.

The motion is overruled.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.