Paul HERRERA, Jr., Appellant,

v.

The STATE of Texas, Appellee.

No. 07–82–0157–CR.

Court of Appeals of Texas,
Amarillo.

July 20, 1983.

Discretionary Review Refused
Jan. 18, 1984.

Law Offices of O'Shea & Hall, P.C., Mark C. Hall, Lubbock, for appellant.

John T. Montford, Dist. Atty., Yvonne M. Faulks, Asst. Dist. Atty., Lubbock, for appellee.

Before DODSON, COUNTISS and BOYD, JJ.

BOYD, Justice.

Appellant Paul Herrera, Jr. brings this appeal from his conviction for the offense of voluntary manslaughter, Tex.Penal Code Ann. § 19.04. Punishment was assessed

by the jury at twenty years confinement in the Texas Department of Corrections. For the reasons hereinafter set out, we reverse the judgment and remand the cause for a new trial.

On February 5, 1979, the body of Israel Duran was discovered in a turnrow east of Lubbock. The autopsy revealed that Duran had died from multiple gunshot wounds. The appellant, who was one of the last persons seen with Duran while the latter was still alive, was questioned by the Lubbock police some hours after Duran's body had been discovered. He gave the police a witness statement at the conclusion of the questioning. Appellant was also asked to take a polygraph test. The next day, appellant returned to the police station and took the polygraph test. Following the test, the appellant was questioned some more about the case and he then made a second statement in which he detailed his involvement in Duran's death. He was then arrested. Trial ensued, resulting in the conviction from which this appeal is taken. Additional pertinent portions of the evidence will be referred to in the discussion of the ground of error to which those facts relate.

In his appeal, appellant raises six grounds of error. Appellant contends, in his first ground, that the trial court erred in admitting into evidence his statement, in which he detailed his involvement in Duran's death, because said statement was made subsequent to an illegal arrest and was not freely given. In his second ground of error, appellant argues that the trial court erred in denying his motion for new trial because the record showed that juror Flournoy had failed to respond to the prosecution's and appellant's questions on voir dire examination. Appellant's third ground of error complains of the trial court's failure to grant his motion for mistrial because of the prosecutor's allegedly prejudicial and improper remarks to the jury during his closing jury argument. In his fourth ground of error, the appellant contends that the trial court committed reversible error when it refused to allow a demonstration in the presence of the jury of the speed

in which the deceased arguably could have pulled a knife.

Appellant also argues, in his fifth ground, that the trial court erred in failing to grant his motion for mistrial when the deceased's mother collapsed in open court. He asserts that this "reprehensible action of victim's mother [was] so highly prejudicial and inflammatory as to negate the possibility of a fair trial proceeding." Finally, in his sixth ground of error, the appellant complains of the trial court's failure to sustain his objection to the charge because, he claims, the charge shifted the burden of proof to the defendant.

Since it is dispositive of this appeal, we will discuss initially appellant's second ground of asserted error. The alleged juror misconduct occurred during the voir dire examination. During the course of the prosecution's questioning, the following question was asked of the jury panel:

Ladies and Gentlemen, have any of you on the jury panel ever had a direct interest in the outcome of a criminal case? That is, *have you ever been a complaining witness that testified for the State* or the defense or possibly a member of your family or relative was interested in the outcome of a criminal case? If so, would you raise your hands. [Emphasis added.]

None of the proposed jurors raised their hands or otherwise answered affirmatively. Subsequent to trial but prior to the jury's verdict, it was discovered that juror Renee Flournoy had been a complaining witness in an assault case approximately three or four months earlier.

Initially, we note that issues of fact as to jury misconduct raised at a hearing on a motion for a new trial are for the determination of the trial judge and the judge's decision will not be reversed unless an abuse of discretion is shown. *Beck v. State*, 573 S.W.2d 786 (Tex.Cr.App.1978). An abuse of discretion will have occurred when a biased or prejudiced juror is selected without fault or lack of diligence on the part of defense counsel. *Brandon v.*

*State*, 599 S.W.2d 567 (Tex.Cr.App.1979), *vacated on other grounds*, 453 U.S. 902, 101 S.Ct. 3134, 69 L.Ed.2d 988 (1981). When such an abuse of discretion occurs, a new trial should be granted. *Id.; Von January v. State*, 576 S.W.2d 43 (Tex.Cr. App.1978).

▆▆▆ The voir dire process is designed to insure, to the fullest extent possible, that an intelligent, alert, disinterested, impartial and truthful jury will perform the duty assigned to it. *Jones v. State*, 596 S.W.2d 134, 137 (Tex.Cr.App.1980). The record shows that juror Flournoy had, prior to appellant's trial, been the victim of an assault. While the offenses of murder and voluntary manslaughter are distinct from the offense of assault, there are significant similarities, particularly in that all three offenses involve a physical attack on the body. Flournoy could reasonably have been expected to have been influenced by her own recent experience, and that influence might have been sufficient for her to vote for a guilty verdict, even though the evidence may not have established such guilt. Her failure to respond to the question deprived defense counsel of an opportunity to explore the existence of bias and prejudice on her part. In such circumstances, we think good ground exists for a new trial. *See Von January v. State*, 576 S.W.2d 43 (Tex.Cr.App.1978).

We think the case law mandates this conclusion. In *Salazar v. State*, 562 S.W.2d 480 (Tex.Cr.App.1978), a juror had failed to disclose during voir dire that he had been an eyewitness to a sexual assault on his own daughter by a Mexican-American male about five years earlier and that he had been a complaining witness in the subsequent trial. The defendant Ruben Salazar was charged with the offense of indecency of a child. Salazar was also a Mexican-American male. The Court of Criminal Appeals concluded that the juror was incapable of being fair and impartial toward the defendant because of the similarities between the offense charged against Salazar and the offense committed against the juror's daughter. In *Norwood*

*v. State*, 123 Tex.Cr.R. 134, 58 S.W.2d 100 (1933), the defendant was charged with committing the offense of rape. A juror had failed to disclose during the voir dire examination that his sister had previously been the victim of a sexual offense. The Court of Criminal Appeals ruled that this juror had failed to disclose a material fact concerning his ability to render a fair and impartial verdict and that the jury's verdict, consequently, could not stand. As the *Norwood* court noted:

> Had the juror revealed the fact that his sister had suffered an experience similar to that of the prosecutrix, [the defendant] would not have accepted him. Relying upon the answer of the juror, [the defendant] was deprived of his right to peremptorily challenge him.

Similarly, in the case at bar, had juror Flournoy revealed the fact that she had suffered an assault and that she had been a complaining witness, the appellant in all reasonable probability would not have accepted her. "Where a juror withholds material information in the voir dire process, the parties are denied the opportunity to exercise their challenges, thus hampering their selection of a disinterested and impartial jury." *Salazar v. State*, 562 S.W.2d at 482.

The State cites several cases in which the Court of Criminal Appeals upheld the trial court's denial of a motion for mistrial after admitted juror misconduct had been brought to the attention of the trial court. However, we believe these cases are distinguishable from the instant case. In *Tonche v. State*, 478 S.W.2d 93 (Tex.Cr. App.1972), the juror misconduct consisted of a juror being allowed to ask the trial judge several questions following the defendant's testimony but before the jury had retired to deliberate. In *Stein v. State*, 514 S.W.2d 927 (Tex.Cr.App.1974), the juror misconduct consisted of a juror being approached by a reporter, before the parties had rested, who told her, "I wouldn't want to be in your shoes." In *McMillon v. State*, 505 S.W.2d 872 (Tex.Cr. App.1974), the defendant charged that a

juror had failed to disclose during voir dire examination that she (the juror) had had substantial contact with the defendant prior to trial in her profession as a practicing attorney. The juror denied that she had had any contact with the defendant prior to the trial. The Court of Criminal Appeals ruled that the trial court was entitled to believe the juror's assertion and to disbelieve the defendant's and, thus, the evidence failed to show juror misconduct. In none of these cases, did the proven juror misconduct have any bearing on the juror's ability to render a fair and unbiased verdict. The juror misconduct in the instant case, in stark contrast, does go directly to the juror's ability to be impartial and fair.

■ While the record shows that juror Flournoy withheld material information from the court during voir dire which impacted on her ability to render a fair and impartial verdict, we must also find that the appellant was without fault or lack of diligence in the court's failure to uncover this material information, in order for a reversal to be mandated. Here, the prosecutor expressly asked the jurors, including juror Flournoy, if any of them had ever been a complaining witness in a criminal trial. Flournoy remained silent. The prosecutor's question could not have been more on point. Under these circumstances, the appellant was justified in believing that Flournoy had never been a complaining witness in another trial. We conclude, therefore, that appellant was without fault or lack of diligence and that he acted in good faith reliance on Flournoy's responses to inquiries on this matter. He was, consequently, deprived of his right to peremptorily challenge the juror. Accordingly, appellant is entitled to a new trial. *Brandon v. State*, 599 S.W.2d 567 (Tex.Cr.App.1979), *vacated on other grounds*, 453 U.S. 902, 101 S.Ct. 3134, 69 L.Ed.2d 988 (1981).

Since the question will again arise upon a retrial of the case, it now becomes necessary to discuss ground of error one. For the reasons explained below, we conclude that the court acted properly in admitting the statements into evidence.

■ It is axiomatic that all evidence obtained by the State as a result of a person's illegal arrest is inadmissible at his subsequent trial. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). "[T]he exclusionary sanction applies to any 'fruits' of a constitutional violation—whether such evidence be tangible, physical material actually seized in an illegal search, items observed or words overheard in the course of the unlawful activity, or confessions or statements of the accused obtained during an illegal arrest and detention." *United States v. Crews*, 445 U.S. 463, 470, 100 S.Ct. 1244, 1249, 63 L.Ed.2d 537 (1980). In order to determine what evidentiary consequences follow from the Lubbock police's questioning of the appellant, we must initially determine whether the appellant was "seized" by the police and, if so, whether this seizure was unlawful.

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated ..." There is no question that the appellant possessed this constitutional right of personal security when he was approached by Deputy Rector and the other officers of the Lubbock police department on February 5, 1979.

■ However, law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another place, such as a parking lot, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. *Florida v. Royer*, —— U.S. ——, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. *Id.; United States v. Mendenhall*, 446 U.S. 544, 555, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). The person ap-

proached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. *Florida v. Royer,* —— U.S. at ——, 103 S.Ct. at 1324, 75 L.Ed.2d at 236. He may not be detained even momentarily without reasonable, objective grounds for doing so. *Id.; United States v. Mendenhall,* 446 U.S. at 556, 100 S.Ct. at 1878. If there is no detention—no seizure within the meaning of the Fourth Amendment—then no constitutional rights have been infringed. *Florida v. Royer, supra.*

In order to determine whether the police have "seized" a person within the meaning of the Fourth Amendment, it is necessary to examine all the circumstances surrounding the incident. *United States v. Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877. If, after viewing all the circumstances, it appears that a reasonable person would have believed that he was not free to leave, then that person will have been "seized" by the police. *Id.* In order to help resolve this question, the Supreme Court has indicated certain factors which would tend to show that the person had been seized:

> Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

*Id.* The Court concluded that "[i]n the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person." *Id.* at 554–555, 100 S.Ct. at 1877.

In the instant case, the record indicates that the appellant and four companions were in a car at a Dairy Queen parking lot when three or four patrol cars approached the car. Deputy Rector indicated that approximately six to eight patrolmen were in the cars. All of the patrolmen wore uniforms and were carrying sidearms, which were visible to the appellant. Deputy Rector indicated that he asked the appellant to accompany him to the police station and that the appellant agreed. Rector further testified that the appellant voiced no objection to his request and that the appellant was cooperative at that particular time. However, Rector did state, on cross-examination, that if the appellant had not consented to his request, the police would have forcibly taken him into custody.

■ We recognize, initially, that a reasonable person is willing on occasion to cooperate with the police. A reasonable person recognizes the important and difficult job that the police have in apprehending criminals and keeping the peace. He also realizes that without the cooperation of private citizens, the police would find it difficult, if not impossible, to effectively protect society from crime. *See Gomez v. Turner,* 672 F.2d 134, 141–142 (D.C.Cir. 1982); *United States v. Collis,* 699 F.2d 832 (6th Cir.1983). Consequently, we cannot assume that a reasonable person only answers police questions or agrees to accompany the police for questioning because of police coercion or intimidation. A more careful examination of the particular circumstances of the police-private person contact is required.

■ In the instant case, however, we believe that the police did seize the appellant as he sat in the car at the Dairy Queen parking lot. As the officers drove up to the parking lot and surrounded the car, all of them wore uniforms and were carrying sidearms. The appellant was told that the police wanted to question him about the murder of the deceased because he (the appellant) was one of the last persons to be seen with the deceased. Appellant was then asked to leave the car and accompany the officers for questioning. With at least six armed officers surrounding him, the appellant would reasonably have felt that he had no choice but to accompany the officers. Further, Deputy Rector indicated that the police would not have let the appellant walk away if he had refused to accompany them. Under these circumstances,

we conclude that the appellant had been seized by the police.

Our conclusion that the appellant was seized is consistent with the most recent case law. In *Florida v. Royer,* — U.S. —, —, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229, 239 (1983), the Supreme Court ruled that the accused had been seized by the police when the record indicated that the police had identified themselves to the suspect as narcotics agents, had told him that he was suspected of transporting narcotics, and had asked him to accompany them to the police room, without indicating in any way that he was free to depart. In *United States v. Jefferson,* 650 F.2d 854 (6th Cir. 1981), the Sixth Circuit decided that the accused had been seized by the police when a narcotics agent had stopped the accused, identified himself as a DEA agent, and requested the accused to accompany him to the airport's baggage claims office. *Cf. United States v. Collis,* 699 F.2d 832 (6th Cir.1983) (court concluded that no seizure had occurred where evidence showed that police officer had approached the accused alone and had merely inquired of him if he would object to answering certain questions). Given the sizeable number of officers present in the instant case and the fact that they were all clearly uniformed and armed, the coercive effect of Deputy Rector's request to the appellant to accompany them was, if anything, greater than the coercive impact of the agents' requests in *Florida v. Royer, supra,* and *United States v. Jefferson, supra.*

 While the State is required to justify its seizure, it is clear that not all seizures of the person need be justified by probable cause to arrest for a crime. *Florida v. Royer,* — U.S. at —, 103 S.Ct. at 1324, 75 L.Ed.2d at 236. The Supreme Court, in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), created a limited exception to the rule that probable cause is required to justify a seizure. Under the *Terry* exception, certain seizures are justifiable under the Fourth Amendment if there is an articulable suspicion that a person has committed or is about to commit a crime. Reasonable suspicion of criminal activity warrants a temporary seizure for the purpose of questioning limited to the purpose of the investigatory stop. *Florida v. Royer,* — U.S. at —, 103 S.Ct. at 1325, 75 L.Ed.2d at 237; *United States v. Brignoni-Ponce,* 422 U.S. 873, 881–882, 95 S.Ct. 2574, 2580–2581, 45 L.Ed.2d 607 (1975). *See also Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981).

 However, *Terry* and its progeny created only a limited exception to the general rule that seizures of the person require probable cause to arrest. Detentions may be "investigative" yet violative of the Fourth Amendment, absent probable cause. In the name of investigating a person who is no more than suspected of criminal activity, the police may not seek to verify their suspicions by means that approach the conditions of arrest. *Florida v. Royer,* — U.S. at —, 103 S.Ct. at 1325, 75 L.Ed.2d at 237. Thus, absent probable cause, custodial interrogation of a citizen is not justified even if the police had reasonable suspicion of the citizen's involvement in criminal activity. *Id.; Dunaway v. New York,* 442 U.S. 200, 207–209, 99 S.Ct. 2248, 2253–2254, 60 L.Ed.2d 824 (1979); *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

It is now necessary to determine whether the police had sufficient justification to seize the appellant. Prior to the time the police detained the appellant at the Dairy Queen parking lot, they had spoken with the deceased's brother Andrew Duran and Andrew's wife, JoAnn. The Durans told the police that they had seen the deceased, the appellant and Richard Gomez in a black 1967 Chevrolet driving around MacKenzie Park in Lubbock around 3:00 p.m. on February 4th, the day before the deceased's body was discovered. They further told the police that the deceased had failed to return home that evening. After receiving this information, the police began looking for a car matching the description the Durans had given them. The car was later located in the Dairy Queen parking lot and

it was at that time that the appellant was seized by the police.

■ The standard for arrest is probable cause, defined in terms of facts and circumstances sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense. *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); *Jones v. State,* 565 S.W.2d 934 (Tex.Cr.App.1978). In the instant case, the police had evidence that the appellant was with the deceased the day prior to the murder. Presence alone is not sufficient to constitute probable cause to justify an arrest. *See Sibron v. State of New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); *United States v. Irurzun,* 631 F.2d 60 (5th Cir.1980). Thus, we conclude that the police lacked probable cause to make an arrest when they seized the appellant.

■ However, as we noted above, the police may stop a person under certain limited circumstances, even though they do not have probable cause to arrest, as long as they have a reasonable suspicion that he has committed or is about to commit a crime. *Terry v. Ohio, supra.* In determining what cause suffices to authorize the police to stop a person, the totality of the circumstances, the whole picture, must be taken into account and, based on that totality, the detaining officer must have a particularized and objective basis for suspecting the person stopped of criminal activity. *United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 1690, 66 L.Ed.2d 621 (1981). *See also Williams v. State,* 621 S.W.2d 609 (Tex.Cr. App.1981). The evidence collected by the police prior to the stop must be seen and weighed by the reviewing court not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement. *United States v. Cortez,* 449 U.S. at 418, 101 S.Ct. at 695.

■ Viewing the totality of the circumstances in the instant case, we conclude that the police had a reasonable suspicion, based upon specific facts, that the appellant had committed or had participated in the commission of the offense. The police had information from the deceased's brother and sister-in-law that they had seen the appellant with the deceased in a black 1967 Chevrolet about 18 hours prior to the time that the deceased's body was discovered. When the police saw the appellant on the afternoon of February 5th in a black Chevrolet matching the Durans' description, they had sufficient articulable facts in their possession to give them a reasonable suspicion of the appellant's involvement in the offense. They were, thus, justified in seizing the appellant at that time.[1]

■ While we have concluded that the police were justified in seizing the appellant, it does not follow that the seizure itself was lawful. Since this seizure was based upon a reasonable suspicion and not upon probable cause, the State must show that the seizure was temporary and lasted no longer than was necessary to effectuate the purpose of the seizure. *Florida v. Royer,* — U.S. —, —, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229, 238 (1983). Specifically, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. *Id.* Further, it is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure. *Id.*

■ In the instant case, we conclude that the investigative methods employed were the least intrusive means reasonably available to verify or dispel the official

---

1. It is immaterial that the appellant may not have posed a danger to the police or to bystanders at the time that the police stopped him. The Supreme Court has repeatedly held that police have the power to stop persons suspected of criminal activity even when they present no apparent danger. *See e.g., Florida v. Royer,* —

U.S. —, —, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229, 237; *Michigan v. Summers,* 452 U.S. 692, 705, 101 S.Ct. 2587, 2595, 69 L.Ed.2d 340 (1981); *United States v. Cortez,* 449 U.S. 411, 421–22, 101 S.Ct. 690, 696–97, 66 L.Ed.2d 621 (1981); *United States v. Brignoni-Ponce,* 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975).

suspicion in a short period of time. When the police approached the appellant in the Dairy Queen parking lot on February 5th, they immediately informed him that they wanted to question him about the Duran murder because he was one of the last persons seen with the deceased prior to his death. Thus, the police got right to the point with the appellant and did not seek to deceive or mislead him as to the purpose of their inquiry. The appellant was also informed, according to Captain Alton Hobb's and Deputy Rector's testimony, that he did not have to talk to the police if he did not wish to do so and that if he wanted an attorney he could have one. The appellant was then asked to accompany the police to the Sheriff's Office for the questioning. He agreed to their request and, without delay, was driven to the Sheriff's Office. At the Sheriff's Office, the appellant gave a statement to the police in which he said that he had been with the deceased on February 4th, that they had driven around the park, and that he had dropped the deceased off at the Cactus Inn, where the deceased resided, sometime during the late afternoon. After he gave that statement, Captain Hobbs asked him if he would agree to submit to a polygraph examination. The appellant agreed and Captain Hobbs set up an appointment for the appellant to take the polygraph test the next day, February 6th. The appellant agreed to come for this appointment. The appellant was not told that he must appear nor was he threatened with dire consequences if he failed to show up for his polygraph session, according to Captain Hobbs and Deputy Rector. In fact, Deputy Rector stated that the appellant was eager to take the polygraph exam.[2] At that point, the police released the appellant. From the time that the police first approached the appellant until he was released that same day, only about one and a half hours had passed.

The record indicates, we believe, that the police made a diligent and successful effort to limit their intrusion on appellant's freedom to as small a degree as was reasonably possible, given their justified need to question him about the death of Israel Duran. Their seizure of the appellant on February 5, 1979 was thus both justified, based on their reasonable suspicion of appellant's involvement in the murder, and limited in scope and duration, so as to satisfy the conditions of an investigative seizure. We conclude that the seizure did not violate the appellant's Fourth Amendment rights. The trial court, therefore, did not err in admitting this statement into evidence.

■ The next day, February 6, 1979, the appellant arrived at the police station in order to take the polygraph examination. The appellant argues that his appearance was coerced by the police. Specifically, he alleges that the police harrassed him on February 6th, while he was at work, in order to ensure that he would submit to the polygraph test. The record, however, shows no such harrassment. All that the record indicates is that Captain Hobbs went to the appellant's place of work in order to tell him that the test was confirmed for 1:00 p.m. that afternoon and to find out if he intended to show up. This would not amount to harrassment or coercion. We conclude that the appellant voluntarily went to the police station to take the polygraph test.

Prior to taking the polygraph test, the appellant was warned of his rights by Ronald Rogers, the polygraph examiner for the Lubbock police department. The appellant also signed a waiver-of-rights form in which he acknowledged his constitutional

---

**2.** The appellant stated, during the pre-trial motion to suppress hearing, that the detectives told him that if he refused to take the polygraph test they would not leave him alone. There was thus a conflict in the testimony between the appellant and Captain Hobbs and Deputy Rector. The trial judge is the sole fact finder at a hearing on a motion to suppress and, as such, he may choose to believe or disbelieve any or all

of the witnesses' testimony. *Taylor v. State,* 604 S.W.2d 175 (Tex.Cr.App.1980). The trial court evidently chose to believe the officers' testimony. Since this decision was within the perogative of the trial judge to make, we will assume, for the purposes of this appeal, that the police did not threaten or coerce the appellant into appearing for the polygraph test.

*Miranda* rights. Captain Hobbs indicated that Rogers was very thorough in explaining the *Miranda* rights to the appellant and that the appellant appeared to understand these rights. Rogers then administered the polygraph test to the appellant. The record supports a conclusion that the appellant voluntarily and knowingly consented to take this test after he had been fully informed of his right not to take the test. We find no infringement on appellant's fourth amendment rights in the administration of the polygraph examination.

The polygraph test indicated that the appellant failed to answer questions truthfully. After the result was made known to the appellant, Captain Hobbs informed the appellant that he had a right not to answer any questions but that, if he did not object, Hobbs would like to ask him a few more questions about the Duran case. The appellant agreed to the captain's request.

Prior to the questioning, the appellant was again informed of his rights. He signed a second waiver-of-rights form in which he again acknowledged his *Miranda* rights, including the right not to answer any questions. The questioning did not begin until after the appellant had been informed of these rights. After about ten or fifteen minutes of questioning, the appellant told Captain Hobbs that he wanted to make a statement about his involvement in the Duran killing. Captain Hobbs testified that the appellant was not offered any promise of immunity, parole, probation, etc. in exchange for his statement. Bonnie Crawford, the police secretary who wrote down appellant's statement, testified that the appellant was very cooperative throughout the entire time the statement was taken. After he had made his statement and Ms. Crawford had typed it out, the appellant asked that Ms. Crawford read the statement back to him, which she did. Appellant then indicated that the statement was correct and he placed his initials on the paper. He also signed the statement, which concluded by saying:

No one has threatened me, or mistreated me in any way, I have not been promised anything, I am giving this statement of my own free will. I have had my rights read to me by Deputy Alton Hobbs. The officers are just doing their job.

Captain Hobbs completed the questioning by again informing the appellant of his rights.

In its written findings, the trial court ruled that appellant's statement was voluntarily and intelligently given and that he had voluntarily and affirmatively waived his rights. Generally, the determination of whether an inculpatory statement was voluntarily made or not depends upon examination of the totality of the circumstances. *Alvarez v. State*, 649 S.W.2d 613 (Tex.Cr.App.1982) (on motion for rehearing). Our examination of the totality of the circumstances convinces us that the trial court's finding as to the voluntariness of the statement was correct. Appellant's first ground of error is overruled.

The disposition which we have made of appellant's second ground of error makes discussion of the remainder of appellant's grounds of error unnecessary, since they concern matters which are not likely to reoccur in the retrial of this cause.

The judgment of conviction in this case is reversed and the cause is remanded for retrial.