**Henry Vernon PETTEWAY, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. C14–87–753–CR.**

Court of Appeals of Texas,
Houston (14th Dist.).

Sept. 8, 1988.

Robert Finlay, Galveston, for appellant.

Mark J. Kelly, Galveston, for appellee.

Before JUNELL, SEARS and CANNON, JJ.

## OPINION

SEARS, Justice.

This is an appeal from a conviction for murder. Appellant was found guilty by a jury and his punishment was assessed at sixty years confinement in the Texas Department of Corrections. We reverse and remand.

Appellant asserts five points of error on appeal all of which concern jury misconduct. Appellant asserts the trial court erred in denying his motion for mistrial where: (1) a juror concealed information that he had personal knowledge of the defendant and had said he would "get him"; (2) a juror concealed information that he had personal knowledge of the family of the deceased; (3) a juror concealed information that he had personal knowledge of the defendant and of the events in issue; (4) a juror used evidence outside the record to make his decision regarding punishment; and, (5) a juror concealed information that he had been the accused in a criminal case.

The evidence at trial revealed that on March 8, 1986, Appellant and the complainant had a fight in a bar. When the fight was broken up and the person who had been holding Appellant released him, Appellant produced a .38 pistol and shot the complainant in the head.

A jury was selected to hear the case on May 18, 1987. The following morning, defense counsel made his first Motion For Mistrial based upon juror misconduct. Defense counsel asserted that juror number twelve, Mr. James Block, had prior knowledge of the killing and had threatened to "get" the Appellant. In addition, defense counsel alleged that Juror Block had communicated with a member of the deceased's family from the jury box. The trial court held a hearing on the motion and several persons were called as witnesses.

During voir dire, the jury panel had been asked if anyone knew Appellant. Mr. Block did not respond to this question. Mr. Block was asked by the prosecutor if there

was any reason that would prevent him from being a fair and impartial juror in the case. Mr. Block responded, "No." Mr. Block was asked by defense counsel if there was anything that might disqualify him as a juror. Mr. Block replied, "No."

At the hearing on the Motion For Mistrial, Mrs. Maureen R. Ward testified that her husband was an attorney and that she was working in his office on March 10, 1986, when Appellant's family came to discuss retaining Mr. Ward to represent Appellant. She recalled that the family was fearful of some form of retribution for the killing, that there was a tall black man outside the office and that one of the Petteways said he was a relative of the deceased.

Appellant's mother, Ruth Joy Petteway, testified that she went to Mr. Ward's office on March 10, 1986, with her daughters and son-in-law. She stated that her daughter saw someone following them, but that she did not see this person. She testified that she knew Mr. Block was close to the deceased's family because she had seen them together before and said she recognized Mr. Block because she had gone to school with him. She further testified that on the previous day she saw Mr. Block throw something from the jury box to members of the deceased's family and saw him smile and talk to them.

Appellant's sister, Jacqueline Pizarro, testified that she was at Mr. Ward's office on March 10, 1986, and that she saw Mr. Block and one of the deceased's relatives, Joe Williams, standing outside across the street from Mr. Ward's office. She said Mr. Block was standing there for a long time, smoking a cigarette and watching the office.

The judge then questioned Juror Block about these allegations. Juror Block testified that he did not recall being at Mr. Ward's office on March 10, 1986. When Mrs. Ward was asked if she recognized Mr. Block or any of the other jurors, she stated that she did not recognize any of them.

Defense counsel moved the court to remove Juror Block and continue the trial with eleven jurors or to grant a mistrial.

Both motions were denied and the trial was recessed until May 21, 1987, for reasons unrelated to this appeal.

When the trial reconvened, defense counsel renewed his Motion for Mistrial and called Mr. Joe Williams, a cousin of the deceased, to testify. Mr. Williams testified as follows:

Q: And did you see Mr. James D. Block out there in front of Mr. Ward's office that day?

A: Yes, I did.

Q: And what do you recall Mr. Block doing?

A: He was standing outside the lawyer's office. I was—he asked me for a light for a cigarette.

Q: Did he say or do anything else?

. . . . .

Q: Was he talking about the case of Gregory Dennis, Green Jeans [the deceased]?

A: Yes, he was.

Q: What, if anything, did he mention about Green Jeans?

A: All he said was that he was going to get Petteway.

Mrs. Ward was then recalled as a witness. She was asked whether she recognized Mr. Williams as the relative of the deceased who had been outside her husband's office on March 10, 1986. She testified that she remembered that Mr. Williams had been to the Ward office a number of times during March, 1986, but that she could not specifically recall whether he was the person she saw on March 10.

The judge then questioned Juror Block about his juror information form. This questioning revealed that although Mr. Block had stated on his juror information form that he had never been an accused in a criminal case, he had actually been convicted of driving under the influence of alcohol, had paid a substantial fine, and was currently on probation. Mr. Block attempted to explain his failure to disclose this conviction by saying that he had completed the form "real fast" and did not read it carefully.

The judge then questioned ·Mr. Block about the allegations that he had spoken with members of the deceased's family:

THE COURT: Do you know Joyce Dennis?

JUROR BLOCK: No. I went to school and she was behind me, but I didn't know her personally.

THE COURT: Have you spoken to Joyce Dennis since this jury of which you are a member was impanelled?

JUROR BLOCK: No.

THE COURT: Have you spoken with any people in the courthouse audience during this trial?

JUROR BLOCK: No.

Juror Block later admitted that he had thrown a pack of gum to a "young lady" who was sitting near Joyce Dennis and said that when she started to throw it back he told her to keep it.

THE COURT: Do you know any of the family of Henry Petteway?

JUROR BLOCK: I'm not sure. There was a number of Petteways running around here in town. I do know a Petteway, but I don't know if he's related to this Petteway.

THE COURT: Which Petteway is that?

JUROR BLOCK: His first name I don't know. He's a heavyset light-brown-skinned fellow. He lives over in Oleander by my mother.

THE COURT: How do you know him?

JUROR BLOCK: I just know him because he lives over in the area.

THE COURT: In your mother's neighborhood?

JUROR BLOCK: Right.

Juror Block further denied that he knew Joe Williams and that he had told Joe Williams that he was going "to get" Henry Petteway.

Juror Block was then questioned regarding his knowledge about the murder:

[PROSECUTOR]: Did you know anything about Gregory Dennis being murdered back in March of 1986?

JUROR BLOCK: I will be very truthful with you. I read the paper sometimes, but it's not an every day occurrence with

the paper with me. I may have heard of Mr. Dennis being shot to death, but you read so many stories of people getting killed these days that I was just thanking God that I was here without any problems.

The court denied the Motion for Mistrial and the trial continued with Mr. Block as a member of the jury.

At the conclusion of the trial, defense counsel sent each juror a questionnaire regarding their experience in the trial. Juror Donald Siegal responded to the questionnaire and his responses indicated that Juror Block had personal knowledge of Appellant and his family, and that his prejudice against them was used improperly during the jury's deliberations. He was called to testify at the hearing on Appellant's Motion for New Trial on July 31, 1987.

Juror Siegal testified that he saw Juror Block throw a pack of gum to people in the courtroom audience but he did not know at that time that they were members of the deceased's family. He testified to misconduct on the part of the jury foreman Mr. Combs and Mr. Block. He stated that after the jury had been sworn, Juror Combs said he felt he knew the Petteway family and he was going to check it out. During the punishment phase of the trial, Juror Combs stated to the other jurors, "You don't know the Petteway family. They're just—they're not a good family" and stated that, "One or two of the Petteway boys is already in the TDC unit." He also stated during a discussion of probation that, "I will not ride down the elevator another day with that Petteway, and he will not walk out on the streets on probation on a murder case."

Juror Siegal testified that Juror Block had also made derogatory remarks about the Petteway family: "You don't know the Petteway family. They're all a bunch of no-goods;" and that he told the other jurors that the Petteways came from a rough area of town. Mr. Siegal further testified:

Q: Did Mr. Block, to your knowledge, make any statements about either Mr. Petteway or the Petteway family either during the sentencing or the guilt or innocence part of the deliberations?

A: During the sentencing, he also had made a statement about the Petteway family not being any good.

Q: Mr. Block said that while you were deciding what length of sentence Mr. Petteway would be given?

A: Right. We had a difference of opinion, and this is when he—him and Mr. Combs both come down with the information about the family saying that that whole family wasn't worth a hill of beans.

Juror Siegal stated that although he and another juror were in favor of probation, and another juror wanted to give Appellant thirty years, Juror Combs and Juror Block were settled on sixty years from the beginning and that they eventually got all the jurors to agree on sixty years. After hearing this testimony, and considering defense counsel's brief on the issue, the trial court denied the Motion for New Trial.

 The accused in all criminal prosecutions has a right to a fair trial by an impartial jury. TEX. CONST. art. I, Sec. 10; *Shaver v. State*, 162 Tex.Crim. 15, 280 S.W.2d 740, 742 (1955). The voir dire process is designed to insure, to the fullest extent possible, that an intelligent, alert, disinterested and impartial jury will perform the duty assigned to it. *Salazar v. State*, 562 S.W.2d 480, 482 (Tex.Crim.App. 1978). An impartial jury is one which favors neither party, which is unprejudiced, disinterested, equitable, and just and is composed of jurors who have not prejudged the merits of the case. *Shaver v. State*, 280 S.W.2d at 742. The jury acts as a unit and the disqualification or prejudice of one of its members destroys the impartiality of the body and is sufficient, upon a motion for new trial, to vitiate the verdict. *Salazar v. State*, 562 S.W.2d at 482; *Shaver v. State*, 280 S.W.2d at 742; *Norwood v. State*, 123 Tex.Crim. 134, 58 S.W.2d 100, 101 (1933).

 Where a juror withholds material information in the voir dire process, the parties are denied the opportunity to exercise their challenges, thus hindering their

selection of an impartial and disinterested jury. *Salazar v. State*, 562 S.W.2d at 482. When a partial, biased or prejudiced juror is selected without fault or lack of diligence on the part of defense counsel, who has acted in good faith upon the answers given to him on voir dire unaware that they are inaccurate, good ground exists for a new trial. *Von January v. State*, 576 S.W.2d 43, 45 (Tex.Crim.App.1978); *Norwood v. State*, 58 S.W.2d at 101. There are two categories of cases where the information withheld has been found to be material, thus requiring reversal: (1) where a juror withholds information that he had personal knowledge about or was in some way acquainted with either the complainant or the defendant; and (2) where a juror by reason of past personal experiences had the potential to be biased or prejudiced against the defendant. *Fielder v. State*, 683 S.W.2d 565, 571 (Tex.App.—Fort Worth 1985, reversed); *See Von January v. State*, 576 S.W.2d at 45; *Salazar v. State*, 562 S.W.2d at 481–482. Thus, where the evidence establishes that a juror, prior to his selection, formed and expressed an opinion as to the guilt of the defendant, this shows a state of mind toward the defendant which deprives him of his right to a fair trial by an impartial jury. *Shaver v. State*, 280 S.W. 2d at 742.

 Here, although counsel asked questions designed to expose any possibility of prejudice or bias of the jury panel members, Juror Block withheld information that he was acquainted with members of the deceased's family and members of Appellant's family. He further misinformed the parties regarding his prior conviction and his knowledge of the events in issue. Although Juror Block answered negatively when asked if there was anything that might disqualify him as a juror or prevent him from being fair, the evidence established that prior to his selection he had stated that he was "going to get Henry Petteway," indicating prejudice against Appellant. A juror who has expressed bias or prejudice against an accused should be excused as a matter of law. *Williams v. State*, 565 S.W.2d 63, 65 (Tex.Crim.App. 1978); *Gonzalez v. State*, 169 Tex.Crim. 49, 331 S.W.2d 748, 749 (1960). Also, Juror Block used his prior knowledge of Appellant and his family and his prejudice toward them to influence other members of the jury during deliberations and to increase the punishment assessed for Appellant.

The trial court is the trier of fact at the hearing on a motion for new trial and his findings will not be disturbed absent a showing that he abused his discretion. *Jones v. State*, 596 S.W.2d 134, 138 (Tex. Crim.App.1980). We find from our review of the record that it was evident early in the trial that Juror Block had withheld material information and had the potential to be biased or prejudiced against Appellant. This prejudice and its effect on the jury was established without contradiction at the hearing on the motion for new trial.

The jury system is the cornerstone of our judicial system and its purity should not be taken lightly. *Von January v. State*, 576 S.W.2d at 46. Therefore, we must vigorously protect the rights of any accused to a *fair* trial by a jury untainted by bias or prejudice. It is an abuse of discretion to refuse to grant an accused a new trial where a biased juror is selected without fault or lack of diligence by defense counsel. *Herrera v. State*, 665 S.W.2d 497, 500 (Tex.App.—Amarillo 1983, pet. ref'd). We hold that the trial court abused its discretion in denying Appellant's motion for mistrial and in refusing to grant Appellant's motion for new trial. Appellant's points of error one through five are sustained.

Accordingly, the judgment of the trial court is reversed and the cause is remanded for a new trial.