**Pamela Ruth McGoldrick FIELDER, Appellant,**

**v.**

**The STATE of Texas, State.**

**No. 2–82–253–CR.**

Court of Appeals of Texas, Fort Worth.

Jan. 23, 1985.

Pizzitola, Hinton & Sussman, Michael J. Hinton and Stanley G. Schneider, Houston, for appellant.

Tim Curry, Dist. Atty. and Joe C. Lockhart, Asst. Dist. Atty., Fort Worth, for the State.

Before HUGHES, JORDAN and JOE SPURLOCK, II, JJ.

## OPINION

JOE SPURLOCK, II, Justice.

Appellant, Pamela Ruth McGoldrick Fielder, shot and killed her husband, Darwin Fielder, on July 23, 1981, at their home in Fort Worth, Texas. On her plea of not guilty to the offense of murder, she was found guilty of voluntary manslaughter. The jury assessed punishment at two years in the Texas Department of Corrections.

We affirm.

Fielder raises nine grounds of error on appeal. As none challenge the sufficiency of the evidence, the facts of the case will be reviewed only in regard to her grounds of error.

In ground of error one, Fielder contends that she was deprived of her rights guaranteed under: 1) the Double Jeopardy provision of the Fifth Amendment and Article One, Section Fourteen of the Texas Constitution; and 2) the Due Process Clause of the Fourteenth Amendment and Article One, Section Nineteen of the Texas Constitution. Fielder alleges she was wrongfully tried twice for the same offense as the first trial ended in a mistrial due to prosecutorial misconduct.

The first trial of Fielder commenced on April 19, 1982. On April 30, 1982, a mistrial was granted on defendant's mo-

tion. On June 21, 1982, Fielder filed defendant's special plea of jeopardy and a hearing was conducted on August 2, 1982. On August 6, 1982, the trial judge filed findings of fact and conclusions of law in connection with the August 2, 1982, hearing on defendant's special plea of former jeopardy. The controlling authority in a situation where a mistrial, due to prosecutorial misconduct, has been declared on the defendant's own motion is the Supreme Court's holding in *Oregon v. Kennedy,* 456 U.S. 667, 102 S.Ct. 2083, 2089, 72 L.Ed.2d 416 (1982) where it was held that: "only where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of Double Jeopardy to a second trial after having succeeded in aborting the first on his own motion."

The trial court's findings of fact numbers fifteen through eighteen state: "15) [c]ounsel for the State did not intend to provoke defense counsel into moving for a mistrial; 16) [c]ounsel for the State did not intend to cause a mistrial; 17) [n]o benefit or detriment accrued to either the State or the Defendant beyond the normal disclosures attendant to any re-trial of a criminal case; and 18) [n]othing was demonstrated to the re-trial court to cause a conclusion that the State had reason to fear that the case was being lost; that acquittal was imminent; or that the State might fare better on a second presentation." These facts, if true, would preclude the defense of double jeopardy being raised under the authority of *Oregon v. Kennedy.*

■ At the August 2, 1982, pretrial hearing, the trial court was the trier of fact and the sole judge of the credibility of the witnesses and the weight to be given their testimony and "[t]he findings of fact and conclusions of law filed by the trial court should not be disturbed absent a clear abuse of discretion." *Stone v. State,* 583 S.W.2d 410, 413 (Tex.Crim.App.1979). Fielder contends that the record does not support the trial court's findings of fact and conclusions of law. The record before this court does not, however, contain a

statement of facts from either the first trial or the hearing held on August 2, 1982. As stated by the Court of Criminal Appeals of Texas in *Anderson v. State,* 635 S.W.2d 722, 726 (Tex.Crim.App.1982), "when the record fails to contain the evidence offered in support of the plea of jeopardy, this Court is in no position to review a contention asserting that a trial court erred in overruling the plea." We find that the trial court did not abuse its discretion in its findings of fact or in overruling the appellant's special plea of former jeopardy. Fielder's ground of error one is overruled.

Fielder's grounds of error two, seven and eight are closely related in that they pertain to error surrounding a single juror, Joe Manuel Carranza. Ground of error two contends that Fielder was deprived of an impartial jury since a juror, through no fault of the appellant, withheld material information which precluded her from effectively exercising her right to peremptory challenge or challenge for cause. Ground of error seven contends that the trial court erred in failing to grant Fielder's motion for new trial because the jury, after having retired to deliberate upon the case, received other evidence detrimental to the accused. Ground of error eight contends that Fielder was denied a fair and impartial trial based upon jury misconduct in discussing facts not admitted in evidence.

Prior to trial, the court had approved the use of juror information sheets to aid in the jury selection process. A proposed questionnaire was submitted by the State, slightly modified by agreement of the parties and accepted by the court. The juror information sheet contained the following question: "Have you, any member of your family, or close friend, been charged with a crime?" At trial, the court explained certain matters and expounded on certain questions contained in the juror information sheets. The court stated:

Now, have any member of your family or close friend been charged with a crime. Speeding, overparking, jaywalking are crimes. We are not interested in

finding out if somebody has gotten a ticket for a minor traffic violation. If it's a major violation, such as driving while intoxicated or some type of recklessness that really became a serious matter, you might include that, but primarily, we are concerned with the more serious misdemeanor and any felony.

Joe Manuel Carranza, a prospective juror who was later impanelled in the present case, answered this question in the negative.

During voir dire, another prospective juror in the present case, James Everett Busbee, was questioned regarding his affirmative response to this same question. Busbee stated that a "[f]riend of mine was arrested for DWI." Subsequently, it was learned that Carranza was serving a term of two years probation for misdemeanor driving while intoxicated. During the jury's deliberations on punishment, Carranza related to the other jurors the fact that he was on probation and made certain representations to the jury concerning his probation.

A hearing on Fielder's motion for new trial was held on December 9, 1982. At the hearing, Carranza was questioned about his answer on the juror information sheet. On direct examination by counsel for appellant, Carranza testified that he had answered the question negatively because he "figured a crime would be like a felony." He also testified that at the time he answered the question he was on probation in Tarrant County for the offense of driving while intoxicated.

Carranza was further questioned about what had taken place at voir dire. Carranza recalled the jury panel being asked as a group the question, "Have you or any member of your family ever been charged with a crime?" He did not recall Mr. Busbee, who later turned out to be the foreman of the jury, standing up and stating that he had a friend who had been arrested for D.W.I.

Counsel for the appellant then questioned Carranza about the jury's deliberations on punishment. Carranza testified

that the jury talked about different forms of punishment including probation and what would be required of a person on probation. He testified that during those deliberations, he mentioned to the other jurors that he was on probation at that time. In response to questions concerning what he had told the jurors about probation Carranza stated, "I just said you have to go by the rules that are stated on the—on the forms," and that "I had to report every month."

Upon cross-examination, Carranza testified that he never told the jury that the defendant did not have to follow the conditions of probation set by the judge. Carranza further testified that during voir dire, he determined that since he was on probation for a traffic offense it was not the type of crime that the attorneys were interested in and that he did not intentionally mislead the court.

Ten of the remaining eleven jurors also appeared and testified at this hearing. The affidavit of the twelfth juror was admitted into evidence. All of these jurors admitted that some discussion of Carranza's probation had taken place. All of the jurors additionally stated that these discussions in no way affected their individual determination of the proper sentence to impose on the appellant. Only one of the jurors, Maggie Burke Mooney, recalled the term "inconvenience" to have been used by Carranza in describing probation. Mooney testified as follows:

[By counsel for appellant]

Q. (By Mr. Gandy) All right. What did he say?

A. That he was—he had to report to his probation officer and that *he wasn't free,* well, *he felt like he wasn't*—he had to report to his probation officer. *He couldn't go and come as he had once did.* If he would leave town, he would have to report, and that's all that I remember.

Q. Did he make any statement about whether he considered that punishment or not?

A. I don't think so. I didn't hear him mention that.

Q. Did he describe probation as being an inconvenience?

MR. WORLEY: Leading, Your Honor.

THE COURT: Well, I'll let her answer the question, but let's stop leading our witness, please, Counsel.

You may answer the question.

THE WITNESS: Yes, he thought it would be an inconvenience.

Q. (By Mr. Gandy) All right. What did he say about it being an inconvenience? Do you recall? As closely as you remember.

A. Well, just as I said before, he would have to report to his probation officer, you know, at any time that he wanted to leave Fort Worth, and that's all I could— [Emphasis added.]

On cross-examination by the State, Mooney testified that she based her verdict on the evidence presented at the punishment phase of the trial and that Carranza's being on probation did not have anything to do with her decision. Mooney further testified, that she, in fact, came down in her judgment as to what the appropriate number of years should be.

Fielder asserts that Carranza's inaccurate answer to the question on the juror information sheet constituted a withholding of material information. She contends that this withholding misled her on a material issue and deprived her of the right to challenge Carranza peremptorily or for cause. We do not agree.

■ It is the well-settled law of this state that "the trial judge is the trier of fact at the hearing on a motion for new trial and that his findings thereon will not be disturbed absent a showing that he abused his discretion." *Jones v. State,* 596 S.W.2d 134, 138 (Tex.Crim.App.1980). *See Shaver v. State,* 162 Tex.Crim. 15, 280 S.W.2d 740 (1955) and *Ladd v. State,* 153 Tex.Crim. 407, 220 S.W.2d 660 (1949). Adequate grounds for a new trial exist where a juror withholds material information in the voir dire process thereby depriving the defense counsel of the opportunity to challenge the prospective juror. The Court of Criminal Appeals in *Von January v. State,* 576 S.W.2d 43, 45 (Tex.Crim.App.1979), stated that "[w]hen a partial, biased, or prejudiced juror is selected without fault or lack of diligence on the part of defense counsel, who has acted in good faith upon the answers given to him on voir dire not knowing them to be inaccurate, good ground exists for a new trial." Under such circumstances, it would be an abuse of discretion for the trial court to refuse to grant a new trial.

For good grounds to exist, requiring a new trial, it must be shown that the information withheld was material. *See Salazar v. State,* 562 S.W.2d 480, 482 n. 5 (Tex.Crim.App.1978). The cases where the information withheld has been found to be material, thus requiring reversal, can be divided into two categories. Reversible error has been found where the juror withholds information that he had personal knowledge about or was in some way personally acquainted with either the complainant or the defendant. *See Von January,* 576 S.W.2d at 45 and *Babin v. State,* 149 Tex.Crim. 339, 194 S.W.2d 563 (1946), where no reversible error was found to exist. The second category contains those cases where reversible error exists when the juror by reason of past personal experiences had the potential to be biased or prejudiced against the defendant. In these cases, the juror withholds information that he had been personally affected by criminal activities similar to the criminal act with which the defendant is charged. *See Salazar,* 562 S.W.2d at 480; *Norwood v. State,* 123 Tex.Crim. 134, 58 S.W.2d 100 (1933); and *Bolt v. State,* 112 Tex.Crim. 267, 16 S.W.2d 235 (1929).

■ The information withheld by Carranza in the present case does not fit within either of the above categories. In cases where jury misconduct is alleged as requiring a new trial, "each case must be governed by its own peculiar facts." *Autry v. State,* 143 Tex.Crim. 252, 157 S.W.2d 924,

931 (1942). Under the facts of the present case, the withholding of information by Carranza appears unintentional. Following the explanation of this particular question given by the trial court, Carranza, in good faith, answered the question in the negative. We find that the information withheld was not material and Carranza was not shown to be partial, biased or prejudiced toward Fielder. We find that the trial court did not abuse its discretion in refusing to grant a new trial based on such alleged jury misconduct. Fielder's ground of error two is overruled.

Fielder contends that the discussion of Carranza's probation during the jury's deliberations on punishment constituted the receipt of other evidence detrimental to herself. "Where the jury, after having retired to deliberate upon a case, has received other evidence," the defendant is entitled to a new trial. TEX.CODE CRIM.PROC. ANN. art. 40.03(7) (Vernon 1979). In defining and applying this statute, the Court of Criminal Appeals has stated:

> In order to mandate a new trial, the "other evidence" must (1) be received by the jury and (2) be detrimental to the defendant. *Trevino v. State,* 582 S.W.2d 111 (Tex.Cr.App.1979). If there is conflicting evidence on the issue of whether the jury received the evidence, a fact question is presented, and the trial court's determination of the question will be overturned on appeal only if an abuse of discretion is shown. *Honeycutt v. State,* 157 Tex.Cr.R. 206, 248 S.W.2d 124 (1952); *McIlveen v. State,* 559 S.W.2d 815, 819 (Tex.Cr.App.1977) (reh. denied 1978).

*Hunt v. State,* 603 S.W.2d 865, 868 (Tex. Crim.App.1980).

The court's charge on punishment, in the present case, instructed the jury to determine if Fielder should be granted probation. The charge set out the circumstances under which probation may be granted. The conditions of probation which the court might impose upon Fielder were also contained in the charge. Two of the conditions contained in the charge were: d) That she report to the probation officer as directed by the judge or probation officer and obey all rules and regulations of the probation department; and g) That she remain within a specified place. The issue of probation as well as the terms and conditions thereof were therefore, properly before the jury for their consideration. Specifically, the conditions that the defendant report to a probation officer and that her freedom of movement would be restricted by probation were properly before the jury.

Of the ten jurors who appeared at the hearing on motion for new trial other than Carranza, only eight testified as to the content of Carranza's statements concerning probation. These jurors testified that reporting to a probation officer and restriction of movement were the only two conditions expounded on by Carranza. The testimony of Mooney, mentioned above, as well as the testimony of Evelyn Gardner Franklin, were exemplary of the jurors' recollections of Carranza's statements. Franklin testified as follows:

[By counsel for appellant]

Q. Did he tell the jury what was required of him in being on probation?

A. Reporting once a month, you mean that? What he said in that respect?

Q. Yes, Ma'am.

A. He had to report once a month; and he was on probation for a year; and he had to pay some every month. I don't remember exactly what he said.

Q. Did he tell the jury what was entailed in reporting once a month?

A. No, not really that I remember.

Q. Do you recall how he described probation?

A. Other than—I don't believe he was supposed to leave the city or State or something to that effect. And I don't know—I'm not sure what he said. He wasn't allowed to drive. He didn't really tell us a lot of details of it, other than—

One other juror also testified that Carranza had mentioned the requirement of payments. Every juror, without exception, testified that Carranza's statements in no way affected their final decision.

On the initial issue of whether other evidence was received by the jury, we hold that a relating of *personal knowledge* concerning facts already before the jury does constitute other evidence. This is true even though Carranza's assertions appear to have been little more than affirmance of information contained in the court's charge. Although the jury did receive other evidence, it is necessary that such evidence be detrimental to the appellant before reversal is required.

We find that Carranza's assertions were in line with the court's charge on punishment and were not a misstatement of the law. *See Martinez v. State*, 533 S.W.2d 20 (Tex.Crim.App.1976). No juror testified that Carranza's statement affected his/her decision. *See Powell v. State*, 502 S.W.2d 705 (Tex.Crim.App.1974). The trial court denied the motion for new trial, implying a finding that the assertions made by Carranza concerning probation were neither adverse nor detrimental to Fielder. We find no abuse of discretion in the trial court's denial of the motion for new trial in the present case. *See Jones v. State*, 596 S.W.2d at 138; *Appleman v. State*, 531 S.W.2d 806 (Tex.Crim.App.1976); and *Powell*, 502 S.W.2d at 711. Fielder's grounds of error seven and eight are overruled.

Fielder's ground of error four contends that the trial court erred in allowing the prosecution to elicit from a witness, over defense counsel's timely objection, a statement allegedly made by her, pertaining to an extraneous offense. The statement was allegedly made by Fielder to Ed Yeary. The State, during its case in rebuttal, called Yeary as a witness and, upon direct examination, elicited the statement from him.

Prior to eliciting the statement from Yeary, the State questioned Fielder concerning the same incident. On cross-examination of Fielder, the State inquired about an argument which occurred between her and the deceased, Darwin Fielder, around Thanksgiving of 1979. Fielder testified that she recalled having an argument with her husband, Darwin Fielder, during Thanksgiving of 1979 and that Darwin left home and went to the Clayton House to spend the night. She further testified that she called him at the Clayton House and then went there to apologize but was unable to because she did not get to see him. At this point, an objection was made to further cross-examination concerning this incident whereupon an offer of proof was made by the State. The objection was overruled and the State was allowed to proceed in line with the offer of proof. Fielder then testified that she did not recall having a telephone conversation with Ed Yeary during the Thanksgiving weekend of 1979. She further did not recall stating to Ed Yeary that, "I've got my gun and if she don't tell me, I'm going to get it," and testified that she "wouldn't have said that" or referred to her gun. Fielder did not recall Yeary coming down to the Clayton House on the evening in question.

Yeary, a certified public accountant, was a close personal and business acquaintance of both Pamela and Darwin Fielder. On direct examination, Yeary testified concerning the incident. From the evidence presented at trial, it appears that Pamela and Darwin Fielder had an argument on this evening. The argument ended with Darwin leaving their home and going to the Clayton House to spend the night. Yeary testified that Pamela Fielder telephoned him from the Clayton House, sometime after 9:30 p.m. She requested that Yeary come to the Clayton House to help in finding Darwin, which he agreed to do and proceeded to the Clayton House to meet with her. Yeary testified concerning a statement made by Pamela Fielder to him:

[By the State]

Q. (By Mr. Worley) Did you have further conversation with the Defendant, without regard to whether it was on the telephone or—

A. (By the Witness) I had further conversation with Pam. She said, yes, I have my gun, and I'm going to find Darwin.

Fielder contends that Yeary's testimony was evidence of an extraneous offense and that its admission was highly prejudicial

and did not tend to prove any element of the offense charged. We disagree.

■ The Court of Criminal Appeals in *Elkins v. State*, 647 S.W.2d 663, 665 (Tex. Crim.App.1983), stated:

It is an established generic principle of evidence that proof of prior specific acts of misconduct, similar happenings or extraneous transactions committed by a party is not probative of the contested material issues in the case on trial, and therefore inadmissible. In a criminal proceeding, when the State seeks admission of an extraneous or similar transaction committed by the accused which constitutes a separate criminal offense, introduction of that "extraneous offense" transaction is inherently prejudicial, since the accused has no notice he will be called to defend against it, and his "propensity to commit crimes" is not material to whether he is guilty of the specified conduct which is charged by the State. [Citations omitted.]

This rule "is not limited to a completed accomplishment of all elements of a penal offense defined in the code. It also embraces proof of similar occurrences, other extraneous transactions." *Gant v. State*, 649 S.W.2d 30, 35 (Tex.Crim.App.), *cert. denied*, ─── U.S. ───, 104 S.Ct. 122, 78 L.Ed.2d 120 (1983) (citations omitted).

Evidence of an extraneous offense or transaction is admissible under certain circumstances. Judge Clinton's concurring opinion in *Rubio v. State*, 607 S.W.2d 498, 506 (Tex.Crim.App.1980) (Clinton J., concurring), states that "extraneous transactions constituting offenses shown to have been committed by the accused may become admissible upon a showing by the prosecution both that the transaction is *relevant* to a *material* issue in the case; and, the relevancy value of the evidence outweighs its inflammatory or prejudicial potential." [Citations and footnotes omitted.] *See Williams v. State*, 662 S.W.2d 344, 346 (Tex. Crim.App.1983); and *Elkins*, 647 S.W.2d at 665.

■ The Court of Criminal Appeals in *Albrecht v. Texas*, 486 S.W.2d 97, 100–101 (Tex.Crim.App.1972), reviewed those cases where evidence of an extraneous offense had been held admissible by stating that:

Evidence of extraneous offenses committed by the accused has been held admissible: (1) To show the context in which the criminal act occurred ... (2) To circumstantially prove identity where the state lacks direct evidence on this issue. (3) To prove scienter, where intent or guilty knowledge is an essential element of the state's case and cannot be inferred from the act itself. (4) To prove malice or state of mind, ... (5) To show the accused's motive, ... (6) To refute a defensive theory raised by the accused. [Footnotes omitted.]

*See Williams*, 662 S.W.2d at 346. The court in *Williams*, explained that this list announced in *Albrecht*, was merely "a list of examples" and should not be construed as either "an exhaustive list of exceptions to nonadmissible extraneous offenses," or "as the test of their admissibility." *Williams*, 662 S.W.2d at 346. The test for admissibility contains three elements which must be satisfied before the extraneous offense may be received into evidence. The elements are: "1) the evidence of the extraneous offense is material, i.e., going to an element of the offense charged in the indictment or information, 2) the accused participated in the extraneous transaction being offered into evidence, and 3) the relevancy to a material issue outweighs its inflammatory or prejudicial potential." *McCann v. State*, 606 S.W.2d 897, 901 (Tex.Crim.App.1980). In the present case, the extraneous act of misconduct testified to by Yeary must meet this test for admissibility.

■ At trial Fielder raised the defensive theory of self-defense. In developing this defense, she portrayed her marriage to Darwin as stormy and marred by physical violence and sexual abuse. Fielder testified that she and her husband had infrequent arguments which erupted into physical violence against her at the hands of Darwin Fielder. She portrayed Darwin as the aggressor and perpetrator of physical

violence in their relationship. In light of such fact, the State, in attempting to prove an unprovoked killing, had a burden to refute such a portrayal of the Fielders' relationship.

The State, on cross-examination of Fielder, initially attempted to impeach her characterization of this relationship. These inquiries by the State were entirely proper. The court held in *Martin v. State*, 157 Tex.Crim. 210, 248 S.W.2d 126, 129 (1952), that "[s]ince the appellant had given his version of the entire transaction, which wrapped the cloak of injured innocence about his shoulders, we feel that it was proper for the State ... to cross-examine him and show his conduct not to have been as innocuous as claimed."[1] Given the propriety of such inquiry and Fielder's denial of the statement, Yeary's testimony became relevant as competent rebuttal evidence.

As stated by the court in *Lolmaugh v. State*, 514 S.W.2d 758, 759 (Tex.Crim.App. 1974), "when the appellant made an issue of self-defense, motive became an issue." The court went on to find that an extraneous offense was admissible to show state of mind or motive. *Id.* at 759. The court in *Halliburton v. State*, 528 S.W.2d 216, 218 (Tex.Crim.App.1975), held that where the appellant testified to self-defense and the absence of intent to kill, the State was authorized to introduce an extraneous offense to show intent. In both cases, the extraneous offense was additionally admissible to refute the defensive theory raised by the accused. In both cases, the extraneous offense admitted into evidence was the shooting, by the accused, of a person, other than the victim of the offense charged in the immediate case.

▮ Fielder testified that she shot her husband in self-defense. Such a defensive theory put in issue both the accused's motive or state of mind and her intent. In such a case, "[t]he ultimate question is whether the extraneous offense tends to disprove the appellant's explanation of the primary offense. The presence or absence of similarity is not entirely determinative of the admissibility of the extraneous offense. If the extraneous offense is relevant in tending to disprove the defensive theory, it should be admissible." *Id.* at 219. The State, in the present case, as in *Halliburton*, was attempting to prove an unprovoked killing by use of a firearm. The prior act of misconduct testified to by Yeary, involved Pamela Fielder and the deceased and arose from those parties' relationship. Yeary's testimony would, if believed by the jury, show Fielder's use of a firearm in an aggressive manner and not merely for defensive purposes in the context of her relationship with the deceased. As did the court in *Martin*, we believe that any testimony evidencing conduct towards the deceased "would clearly be a relevant circumstance going to show the condition of the mind of the accused at the time" of the shooting. *Martin*, 248 S.W.2d at 129. We find that Yeary's testimony about the statement made to him by the accused was relevant.

▮ The second element of the test of admissibility requires a showing that the accused actually committed the extraneous offense. "Even though evidence of an extraneous offense may be relevant to the instant proceedings, such evidence should not be admitted *unless the commission of the other crime is clearly proved and the accused is shown to be the perpetrator.*" *Thompson v. State*, 615 S.W.2d 760, 761 (Tex.Crim.App.1981). Fielder did not recall making the statement attributed to her by Yeary. She did testify that the argument took place and that Darwin had left their home and went to the Clayton House. She also admitted going to the Clayton House

---

1. The transaction referred to by the court was the relationship between the defendant, his wife and the deceased. The defendant's wife left him and began living with the deceased. The defendant testified concerning his relationship with his wife and their separation. On cross-examination, the defendant "was asked if he had not drawn a pistol on his wife and threatened her, causing her to leave him, which question appellant answered in the negative." *Martin*, 248 S.W.2d at 128.

to find Darwin. Any conflict between the testimony of Fielder and Yeary presented a matter to be resolved by the jury as the sole trier of fact and judge of the credibility of witnesses. We find that, when the testimony of Fielder and Yeary are considered together, the evidence is sufficient for the jury to conclude that the incident occurred.

■ As the statement was relevant to show intent, motive or state of mind and to refute the defensive theory of self-defense, the only remaining inquiry is whether the relevancy of such evidence outweighs its potential for prejudice. Prior to the testimony of Yeary, Fielder had testified as to the nature of her relationship with Darwin, and had introduced evidence that violent arguments took place between herself and the deceased. She had also testified as to perverse sexual acts which she and Darwin had engaged in during their marriage. Considering the case as a whole and in light of the testimony of Fielder, we do not believe the admission of her statement into evidence constituted reversible error. *See Smith v. State*, 540 S.W.2d 693, 699 (Tex. Crim.App.), *cert. denied*, 430 U.S. 922, 97 S.Ct. 1341, 51 L.Ed.2d 601 (1977). We find that the relevancy of such evidence, especially in light of her claim of self-defense, outweighed its potential for prejudice to Fielder.

■ Fielder raises one final challenge to the admissibility of this statement by contending that the statement was too remote in time in relation to the offense charged to be admissible. Fielder, herself, testified as to the occurrence of arguments from the very beginning of her relationship with Darwin up until the time of his death. She attempted to prove that her alleged act of self-defense was the culmination of their entire relationship, of approximately five years, yet asserts that this incident, occurring only eighteen months prior to Darwin's death, was too remote in time. Because the incident arose out of Pamela Fielder's relationship with the deceased, and because it was the product of the type of arguments between herself and Darwin,

which took place up until the time of his death, we find that the incident was not too remote in time to defeat its admissibility. *See Yates v. State*, 509 S.W.2d 600 (Tex. Crim.App.), *cert. denied*, 419 U.S. 996, 95 S.Ct. 310, 42 L.Ed.2d 270 (1974); *Baker v. State*, 368 S.W.2d 627 (Tex.Crim.App.1963); and *Washburn v. State*, 167 Tex.Crim. 125, 318 S.W.2d 627 (1958). Fielder's ground of error four is overruled.

■ Fielder's ground of error five contends that the trial court erred by submitting to the jury a charge which did not adequately advise the jury of the relationship between voluntary manslaughter (wherein the jury is authorized to convict if the accused was acting under the immediate influence of sudden passion arising from adequate cause) and self-defense. It is asserted that the charge improperly shifted the burden of proof to appellant to disprove the influence of sudden passion and that this constituted fundamental error. We disagree.

The part of the charge complained of appears as follows:

Now therefore, if you find from the evidence beyond a reasonable doubt that on or about the 23rd day of July, 1981, in Tarrant County, Texas, the defendant, Pamela Ruth McGoldrick Fielder, did intentionally or knowingly cause the death of an individual, Darwin L. Fielder, by shooting him with a firearm, but you further find and believe from all the facts and circumstances in evidence in the case that the defendant, in killing the deceased, if she did, acted under the immediate influence of sudden passion arising from an adequate cause, *or if you have a reasonable doubt as to whether she so acted under the immediate influence of a sudden passion arising from an adequate cause, then you will find the defendant guilty of voluntary manslaughter.* [Emphasis added.]

Unless you find beyond a reasonable doubt that the defendant is guilty of voluntary manslaughter under the instructions given you, or if you have a reasonable doubt thereof, you will acquit

her of voluntary manslaughter and say by your verdict not guilty.

Fielder failed to object to the submission of this charge to the jury. Fielder's failure to object at trial limits this Court to a review for fundamental error. *Jackson v. State,* 591 S.W.2d 820, 824 (Tex.Crim.App.1980). In making such a review, "[t]he charge should be viewed as a whole, and review should not be limited to parts of the charge standing alone." *Daniel v. State,* 486 S.W.2d 944, 947 (Tex.Crim.App.), *cert. denied,* 410 U.S. 958, 93 S.Ct. 1433, 35 L.Ed.2d 692 (1973). *See Jackson,* 591 S.W.2d at 825.

The court in *Jackson* stated that:

A jury charge is fundamentally defective when it:

(1) authorized conviction without proof of an allegation in the indictment which is required to be proved;

(2) authorizes conviction on a different theory than alleged in the indictment;

(3) authorizes conviction on the theory alleged in the indictment and on additional unalleged theories;

(4) authorizes conviction for conduct which is not an offense.

*Jackson,* 591 S.W.2d at 824. Fielder asserts that the shifting of the burden of proof to appellant to disprove the influence of sudden passion before instructing the jury on self-defense was fundamental error. It is unclear how Fielder's contention would come under any one of the four delineated categories set out above. We fail to see how the complained of charge shifted the burden of proof on any element or issue. In support of her contention, she cites: *Braudrick v. State,* 572 S.W.2d 709 (Tex.Crim.App.), *cert. denied,* 440 U.S. 923, 99 S.Ct. 1252, 59 L.Ed.2d 477 (1979); *Gibson v. State,* 659 S.W.2d 34 (Tex.Crim.App.1983) *opinion withdrawn and to be republished,* Docket No. 62,720 (Tex.Crim.App., September 14, 1983) (not yet reported); *Jenkins v. State,* Docket Nos. 64,000–64,004 (Tex.Crim. App., February 16, 1983) (not yet reported);

and *Cobarrubio v. State,* 675 S.W.2d 749 (Tex.Crim.App.1983).

In both *Gibson* and *Cobarrubio,* the Court of Criminal Appeals of Texas gives an example of the proper charge to be given where the accused is on trial for the offense of murder, and the issue of sudden passion is injected into the case. *Gibson, supra* at 2 of slip opinion. *Cobarrubio,* 675 S.W.2d at 751, n. 8. The examples given regarding the charge on voluntary manslaughter are exactly the same as the instruction appearing in the present case. In *Braudrick,* the jury instruction on voluntary manslaughter was, again, exactly the same as the one appearing in the present case. *Braudrick,* 572 S.W.2d at 710–711. The court in *Braudrick,* impliedly approves of such charge. The court in *Ex parte Buggs,* 644 S.W.2d 748, 750 (Tex. Crim.App.1983) cites with approval *Cobarrubio,* and goes on to give the proper charge for voluntary manslaughter by stating:

Thus, when a jury is properly charged on murder and on voluntary manslaughter, as a lesser included offense, it will be authorized to find an accused guilty of voluntary manslaughter if it believes from the evidence beyond a reasonable doubt that the accused

"did intentionally or knowingly cause the death of an individual, CD, by shooting him with a gun, but you further find and believe from the facts and circumstances in evidence in the case that the defendant, in killing the deceased, if he did, acted under the immediate influence of sudden passion arising from adequate cause, *or if you have a reasonable doubt as to whether he so acted under the immediate influence of a sudden passion arising from an adequate cause, then you will find the defendant guilty of voluntary manslaughter."* [Footnotes omitted.] [Emphasis added.]

Fielder argues that the jury was first instructed to consider the elements of vol-

untary manslaughter and that if the jury had a reasonable doubt as to whether she acted under the immediate influence of a sudden passion arising from adequate cause, they should still find her guilty of voluntary manslaughter. It is asserted that in the instant case this improperly shifted the burden of proof to Fielder to disprove she was acting under the influence of sudden passion before the jury was ever instructed on the law of self-defense. Fielder contends that the charge should have instructed the jury that if they had a reasonable doubt as to whether she acted under the immediate influence of sudden passion, they should rule in her favor on the issue of self-defense. We find that Fielder's argument lacks merit. The reasonable doubt spoken of in the charge, set out above, relates to the jurors' beliefs on the issue of "immediate influence of a sudden passion arising from an adequate cause," (a defensive issue) so that, instead of being guilty of the offense of murder, they might find her guilty only of voluntary manslaughter, if they believed she had such passion, or if they had even a reasonable doubt about the passion. It does not shift the burden on the issue of her guilt or innocence of any offense, but permits the jury to find her guilty of the lesser offense (instead of murder) whether they fully believe that passion was involved or not.

Other than the assertions recited above, Fielder does not further develop this ground of error, and seems to argue that by injecting the issue of self-defense into the case, the character and wording of the charge on voluntary manslaughter should somehow be changed. Fielder cites to no authority which directly supports these contentions. Those authorities which are cited, as mentioned above, explicitly approve of the charge given in the case. Although some scholar might one day draw a clearer charge, we find no error in the charge. Fielder's ground of error five is overruled.

In ground of error six, Fielder contends that the trial court erred in failing to grant her motion for mistrial where it was shown that a juror had conversed with other persons regarding the case. She asserts that the trial court abused its discretion by overruling her motion for mistrial and motion for new trial where the evidence established that a juror conversed with unauthorized persons about the case without permission and outside the presence of the court and the State failed to rebut the presumption of harm arising therefrom. We disagree.

During the course of the trial, on September 24, 1982, a man approached counsel for the appellant, Richard Haynes. This man, Curtis Young, informed Haynes that he had on two occasions come in contact with one of the jurors, James Fowler. These contacts occurred by virtue of the fact that Young lived with a woman, Janice Wade, who was a close, long-time friend of Fowler's. Young stated that on these occasions Fowler had spoken about the case and that on one occasion Fowler had made a statement to the effect: "[F]or enough money he could find the accused not guilty." This encounter between Haynes and Young took place on a Friday and on the following Monday, during in-camera proceedings conducted by the court, Haynes reported the encounter to the court.

On Monday afternoon, September 27, 1982, grand jury subpoenas were issued to obtain the immediate presence of both Young and Wade. Counsel for the appellant was notified by the District Attorney's office that such subpoenas had been issued and were in the process of being executed. The District Attorney's office requested that counsel for the appellant be present at the interviewing of Young and Wade. The subpoenas were executed the same day and both Young and Wade were brought in to be interviewed. Young and Wade were questioned separately by both members of the District Attorney's office and counsel for the appellant.

On the evening of September 27th, a written statement was obtained from Young. The relevant part of Young's statement is as follows:

The first time I saw Jimmy Fowler was at Janice Wade's house at 1130 S. Henderson, Fort Worth, Texas. When I came down from upstairs, he was talking about Richard Racehorse Haynes and his being on the jury. She asked him how he was picked and he said say the right things and you'll be picked. Janice asked him what he was thinking and he said she's guilty; he said it didn't make him any difference if she hung or not, that it depended on how he was feeling at the time but if the money was right, he would go either way. He laughed about it but I think he was serious. Jimmy was talking about photos that were being shown in the courtroom and how the D.A. was saying his hand was up defending himselfand [sic] that Racehorse was saying he was trying to hit her. He said "I know he wasn't trying to hit her—she shot him several times."

On Tuesday, September 28, 1982, a statement was taken from Wade. The pertinent part of Wade's statement is as follows:

I have known Jimmy all my life. We went to school and high school together. I asked him what he had beendoing [sic] or where he had been, and he said he was on jury duty. I asked him, "On what jury duty", and he said "The Fielder case".

I said "Boy, they must be out to their minds to want someone like you. Why did they pick you?" Jimmy said, "Cause I'm an upstanding citizen." We laughed, and then he said taht [sic] they asked a lot of questions and then either "you can't tell themeverything [sic]" or "you have to say the right thing" to be picked."

I don't know that much about the case, but I commented that I had heard on T.V. or read in the paper that Mrs. Fielder had killed her husband. Then I said that she must have had a reason. Then I said, "But no matter, she killed her husband."

Jimmy sorta hesitated, then said "I'm not supposed to talk about this. But, boy, you oughta see the evidenee [sic] they

got. The bitch did kill him, but that's not what they [sic] trying to prove.

He then said something to the effect that they were trying to prove she had a reason or was trying to protect herself. Then he said, "You don't know what he did to her—you have to look at all the evidence before you can draw a conclusion."

Then he said, "But you know me, for some money now, I'll say anything." I said, "Quit you're lying. I know you better than that." We all laughed. Then he said he had to go; that he had two people waiting in the car and they were going to a friend's house.

I'm not positive, but I don't recall Jimmy ever saying that he had made up his mind that Mrs. Fielder was guilty.

Jimmy came by the next week at lunch time, but Curtis and I were still in bed. We didn't talk for long because he was on a lunch break. We didn't talk about the fielder [sic] trial at all.

On Tuesday, September 28, 1982, Fielder made a motion to discharge the jury and declare a mistrial. The court continued its in-camera proceedings by questioning each juror individually, out of the presence of the other jurors, as to whether they had either been contacted by or initiated contact with outside persons for the purpose of discussing the case.

During the in-camera proceedings, the court questioned juror Fowler. Fowler testified that he had neither been contacted by nor initiated contact with any person not a member of the jury concerning the present case and his services as a juror. Fowler admitted that he knew Janice Wade and Curtis Young and that he had visited Wade's home recently. Fowler stated that he had not talked to Wade about the case but that she had seen him, Fowler, on TV. He testified that during his visit to Wade's home, that neither Young nor Wade undertook to discuss the case with him but they did mention him, Fowler, being on TV. Fowler stated that he told them that he wasn't supposed to discuss the case. He testified that he had been to Wade's home

twice since he had been on the jury, but that he only saw and spoke to Young during the first visit. Fowler testified that at no time did he discuss the evidence in the case with either Young or Wade. He stated that he never expressed an opinion as to Fielder's guilt or innocence during either visit and that Wade had never said anything concerning Fielder's guilt or innocence. Fowler did testify that Young had expressed his opinion of the case, but that it was nothing that would in any way affect his deliberations as a juror and that he could entirely disregard Young's statements. He further testified that nothing that either Wade or Young may have said would in any way influence his verdict.

At the conclusion of the court's questioning of jurors, the affidavits of both Young and Wade were entered into the record as court's exhibits. The court considered all the evidence produced at the in-camera proceedings and overruled all of Fielder's motions for mistrial and to discharge the jury.

At the hearing on Fielder's motion for new trial the testimony of Young was substantially the same as appeared in his prior statement. Young testified concerning statements made by Fowler about how he came to be on the jury and stated, "[h]e told Janice that you could—if you answered the right questions, you could be on the jury."

Young testified that Fowler discussed items of evidence admitted at trial. He specifically testified that Fowler discussed pictures showing the bullet holes in Darwin Fielder's body. Young was then questioned about Fowler's statement:

[By counsel for appellant]

Q. And what did he say about the pictures showing the bullet hole in the hand?

A. He said he thought she was guilty.

Q. Specifically, Mr. Young, what did—and use just as close to the exact words as you can, what Mr. Fowler said that you heard.

A. He said he thought she was guilty, but for enough money, you know, he would say anything.

Young testified that Fowler had visited Wade's home twice but, that he had not spoken to or seen Fowler during the second visit.

On cross-examination, Young was questioned about Fowler's statement:

[By the State]

Q. Okay. You're not saying that Mr. Fowler ever asked you for any money, are you?

A. No.

Q. You're not saying that Mr. Fowler ever asked you to ask Mr. Haynes for any money, are you?

A. No.

Upon further cross-examination Young admitted that he never represented to Fowler that he, Young, knew anything about the case, was a witness in the case or knew any of the witnesses and that he never told Fowler anything about any evidence in the case. Young testified that he never offered Fowler any money or anything else to affect his verdict.

Wade also testified at the hearing on Fielder's motion for new trial. On direct examination by counsel for appellant, Wade testified that she had heard about the case through television and the newspapers prior to the time she learned that Fowler was on the jury. She testified that upon questioning Fowler about his selection as a juror, that Fowler told her that he had to answer certain questions before he was chosen as a juror.

Wade then testified that she discussed some of the facts and evidence in the case with Fowler. Wade was then questioned about such discussion:

[By counsel for appellant]

Q. All right. And what—do you recall what you discussed?

A. Well, it was something—I was saying something to him about, if she killed him, she must have had a reason. I said, but she killed him, and he was saying something to me about but that you have to see the evidence, or something like that.

Wade further testified that Fowler mentioned "[s]omething about a chair and some pictures" admitted as evidence at trial. Wade did not recall Fowler expressing an opinion about Fielder's guilt or innocence:

Q. (By Mr. Gandy) Did he make any statement to you at all about what he felt about Mrs. Fielder's guilt or innocence at that time?

A. I don't understand.

Q. Did he make any statement to you about what he thought the evidence had shown him up to that point?

A. Well, *no he didn't.* Well, *it didn't sound like he was making an opinion,* I mean, *that he had made up his mind or nothing.* It was something like that he couldn't—that I couldn't say what happened, because well, like I didn't know and I wasn't down here to see what was going on or something, you know, to that effect. That I—well, *he said something about, you couldn't say, you had to see the evidence before you could,* you know, I guess that's what he meant, I don't know. [Emphasis added.]

Wade's testimony concerning Fowler's statement about money was substantially the same as appeared in her previous statement:

Q. Did he make any statement to you about money?

A. Yes.

Q. What did he say?

A. Well, jokingly to me—now, that just my opinion—he said, well, a little money I'll say anything, or something like that, and I said—I told him that I knew he was kidding because I knew him better than that, and we laughed about it.

Wade recalled Fowler relating some of the evidence to her:

Q. Do you recall him making any statements about any of the attorneys representing Mrs. Fielder?

A. Said that—something about "Racehorse" Haynes was trying—

Q. Do you recall what he said?

A. —trying to show that he was trying to hurt her or something like that.

On cross-examination by the State, Wade testified that she had not attempted in any way to affect Fowler's verdict. She testified that she never offered Fowler money nor anything else to affect his verdict. She stated that she never represented to Fowler that she knew any of the witnesses or had personal knowledge of any of the facts in the case. On redirect examination, Wade testified that she and Fowler did not discuss the Fielder case during their second visit.

At the hearing, Fowler continued to deny discussing any aspect of the case with either Wade or Young. Fowler testified that he never discussed any of the evidence and that when Young brought the conversation up he, Fowler, told them that he was not supposed to discuss the case. He testified that he told Wade that he was on the jury only after she mentioned that she saw him on television. Fowler denied telling Wade about the process he went through to be selected as a juror and he specifically denied making the statement about money.

Fielder contends that the evidence establishes that a juror conversed with unauthorized persons about the case without permission and outside the presence of the Court giving rise to a presumption of harm which the State failed to rebut. She asserts that the trial court abused its discretion in failing to grant her motion for mistrial and motion for new trial. We disagree.

Fielder initially contends that the procedure utilized by the Tarrant County District Attorney's office in obtaining the affidavits of Wade and Young was highly prejudicial to her. She complains that defense counsel should have been informed or consulted regarding the issuance of subpoenas for Wade and Young. She further complains of the fact that the affidavits were prepared in the presence of and by the prosecution only. We find no merit to her contentions in this respect.

■ Defense counsel was informed of the issuance of the subpoenas and was present at the questioning of Wade and Young. We find no reason why defense

counsel should have been consulted prior to the issuance of the subpoenas and Fielder cites no authority requiring same. We find that the testimony of Wade and Young at the hearing on motion for new trial was substantially the same as appeared in their previous statements. Fielder has failed to point out any variance between their testimony and statements. We find no prejudice to her in the preparation of the statements of Wade and Young.

We find that Fielder's motion for mistrial was properly overruled by the trial court. The evidence presented during the in-camera proceedings which supported her motion consisted of the affidavits of Wade and Young and the testimony of Fowler. The testimony of Fowler conflicted with the statements made by Wade and Young. Fowler admitted visiting Wade's residence on two occasions, however, he denied discussing any aspect of the case with either Wade or Young and he denied expressing an opinion as to the guilt or innocence of Fielder. Fowler also testified that the fact that Young had expressed his opinion on the case would in no way affect his deliberations. We find that the trial court did not abuse its discretion in overruling Fielder's motion for mistrial. *See Stokes v. State,* 165 Tex.Crim. 269, 305 S.W.2d 779, 780 (1957).

In considering the motion for new trial, the evidence established that the present case was discussed during the first visit by Fowler to Wade's home. Whether the discussion was initiated by Wade or Fowler and whether Fowler even participated in such discussion is immaterial. "It is generally presumed that a defendant is injured whenever an impaneled juror converses with an unauthorized person about a case." *Romo v. State,* 631 S.W.2d 504, 506 (Tex.Crim.App.1982). "This presumption, however, is rebuttable; and on motion for new trial, if the State negates this presumption by showing that either the case was not discussed or that nothing prejudicial to the accused was said, then the verdict should be upheld." *Williams v. State,* 463 S.W.2d 436, 440 (Tex.Crim.App.1971). We find

that the State negated the presumption of harm in the present case by showing that nothing prejudicial to the accused was said.

The evidence, at most, establishes that Fowler discussed certain evidence presented at trial with Wade as well as the manner in which he was chosen as a juror. Fowler's statements concerning how voir dire operates were not prejudicial to Fielder. Fowler probably related to Wade the existence of photographs which showed the crime scene, but relating the existence of such evidence to Wade caused no harm to Fielder. Fowler may well have made a statement to the effect that: "[S]he killed him, but that's not what they are trying to prove." Such a statement would be entirely consistent with the evidence presented at trial and assertions on the part of Fielder that she shot Darwin in self-defense. We do not perceive such a statement as being prejudicial to her.

This brings us to the final statement which is most likely attributable to Fowler, that he made a statement to the effect that "for a little money, I'll say anything". The statement was not made to Young or in response to any inquiry or statement by Young. In fact, Young overheard this statement while descending the stairs from the second floor of Wade's home. The statement was made by Fowler to Wade, a close and long-time friend of Fowler's. Wade testified that the statement was made jokingly and that she and Fowler laughed about it because, as she testified, "I told him that I knew he was kidding because I knew him better than that." Even the affidavit of Young states that "[h]e [Fowler] laughed about it [the statement] but I think he was serious." Under such circumstances, we find no prejudice to Fielder.

We find that Fielder has failed to show that injury arose from the jury misconduct. We also find that the State adequately rebutted the presumption of harm arising from the discussion of the case by Fowler. *See McMahon v. State,* 582 S.W.2d 786, 793 (Tex.Crim.App.), *cert. denied,* 444 U.S. 919, 100 S.Ct. 238, 62 L.Ed.2d 175, *reh'g denied,*

444 U.S. 985, 100 S.Ct. 492, 62 L.Ed.2d 414 (1979). "It is well settled that issues of fact as to jury misconduct raised at a hearing on motion for new trial are for the determination of the trial judge. The court's decision will not be reversed unless an abuse of discretion is shown." *Beck v. State,* 573 S.W.2d 786, 791 (Tex.Crim.App. 1978) (citations omitted). We find no abuse of discretion in the present case. Fielder's ground of error six is overruled.

 Fielder's ground of error nine contends that the trial court erred in entering a finding as to the use of a deadly weapon in the absence of an affirmative finding by the jury. The indictment alleged that Fielder did "intentionally and knowingly cause the death of an individual, Darwin L. Fielder, by shooting him with a firearm." The jury found Fielder not guilty of murder, but guilty of the lesser included offense of voluntary manslaughter. No special issues on the use of a deadly weapon were presented to the jury. The judgment and sentence includes the following statement: "The jury affirmatively found that a deadly weapon, to-wit: a firearm, was used during the commission of the offense."

Fielder filed a motion of judgment nunc pro tunc requesting deletion of the affirmative finding from the judgment, which motion was denied. Fielder asserts that the trial court erroneously entered an affirmative finding of the use of a deadly weapon in the absence of such a finding by the jury. We disagree.

Fielder cites *Barecky v. State,* 639 S.W.2d 943 (Tex.Crim.App.1982), and *Ex parte Thomas,* 638 S.W.2d 905 (Tex.Crim. App.1982), as supporting her contention. These cases are distinguishable from the present case. In *Ex parte Thomas,* the defendant was convicted of aggravated kidnapping and the formal judgment recited that the jury affirmatively found "he used a firearm during the commission of the offense." The verdict of the jury stated that the defendant was "guilty as charged in the indictment." *Ex parte Thomas,* 638 S.W.2d at 906. The court granted the relief prayed for by appellant because "the

indictment did not allege the use of a firearm in the commission of the offense, the use of a firearm was not an issue submitted to the jury, and the verdict 'guilty as charged in the indictment' did not amount to an affirmative finding that a firearm had been used or exhibited in the offense's commission." *Ex parte Thomas,* 638 S.W.2d at 908. In *Barecky,* 639 S.W.2d at 945, the court citing *Ex parte Thomas,* found that the trial court's entry of an affirmative finding that appellant used a deadly weapon was improper where:

> The jury found appellant, "guilty as charged in the indictment." The indictment contains no mention of a deadly weapon. Neither does the court's charge to the jury. Thus, the court entered its finding as to use of a deadly weapon in the absence of such an "affirmative finding" by the appropriate trier of fact. This was improper.

The indictment in the present case specifically alleges that the appellant caused the death of an individual by "shooting him with a firearm." The court's charge on voluntary manslaughter states in part:

> Now therefore, if you find from the evidence ... the defendant, Pamela Ruth McGoldrick Fielder, did intentionally or knowingly cause the death of an individual, Darwin L. Fielder, *by shooting him with a firearm,* ... [Emphasis added.]

We find, therefore, that the present case is distinguishable from both *Ex parte Thomas,* and *Barecky.* We believe the court's opinion in *Ex parte Moser,* 602 S.W.2d 530 (Tex.Crim.App.1980), is the controlling authority on the issue in the present case.

In *Ex parte Moser,* the appellant argued that the jury failed to make an affirmative finding of use of a firearm. The court denied relief finding that:

> The only theory of guilt submitted in the court's charge was that the applicant intentionally or knowingly caused the death of the individual by shooting him with a pistol. The jury found the applicant "guilty of murder as charged in the indictment." In these circumstances, the verdict necessarily included a finding

that the applicant committed murder by shooting the individual with a pistol. Therefore this verdict must amount to an affirmative finding that the applicant used a firearm in the commission of the offense.

*Id.* at 533. The issue in *Ex parte Moser* is very similar to the issue in the present case. The only distinguishing characteristic is that Fielder, in the present case, was found guilty of the lesser included offense.

Fielder attempts to distinguish *Ex parte Moser* by asserting that the jury in that case found the defendant "guilty of murder as charged in the indictment." She emphasizes the use of the phrase "as charged in the indictment" as being significant. We disagree.

The indictment in the present case, alleged that Fielder committed the offense of murder by shooting with a firearm. The offense of voluntary manslaughter is exactly the same as the offense of murder except that the accused causes death while acting under the immediate influence of sudden passion arising from an adequate cause. *Hobson v. State,* 644 S.W.2d 473, 477 (Tex.Crim.App.1983). The elements of the two offenses are exactly the same and "[t]he exception 'is not an element of voluntary manslaughter but is instead in the nature of a defense to murder that reduces that offense to voluntary manslaughter.' " *Hobson,* 644 S.W.2d at 477. Both the court's charge on murder and voluntary manslaughter, in the present case, required the jury to find that Pamela Fielder caused the death of Darwin Fielder "by shooting him with a firearm." The verdict found "the defendant not guilty of murder, but guilty of the lesser included offense of voluntary manslaughter." We find that the jury's verdict under these circumstances included an affirmative finding that Fielder used a firearm during the commission of the offense. We find no error in the judgment entered by the trial court. Fielder's ground of error nine is overruled.

■■■■■ Fielder's ground of error three contends that the trial court erred in excluding the testimony of three expert witnesses who would have testified to facts and circumstances relevant to her state of mind pursuant to TEX.PENAL CODE ANN. sec. 19.06 (Vernon 1974). Fielder argues that she attempted to show the jury, through the testimony of Dr. Beatrice Matheeney, why she did not abandon the marital relationship and through the testimony of Dr. Anson Shupe, Jr. and Dr. William Stacy, the degree of violence she had been subjected to by the deceased. She asserts that the refusal to admit such evidence by the trial court was error. We disagree.

Fielder attempted to prove that she shot and killed her husband while acting in self-defense. Fielder testified that she feared for her life on the occasion in question and this immediate fear caused her to grab the gun and shoot her husband numerous times in self-defense. To support her claim of self-defense, she alluded to instances of marital disorder during which she was physically and sexually abused by her husband, Darwin. After the testimony of Fielder and her reputation witnesses, she called Dr. Beatrice Matheeney as a witness. Dr. Matheeney is a psychologist who has experience in dealing with battered women. During direct examination of Dr. Matheeney, the State objected to further testimony by the doctor as being immaterial and having no relevance to any issue before the court.

The trial court asked for an offer of proof to determine the materiality and relevance of the testimony. Counsel for appellant responded that Dr. Matheeney had experience in the counseling of battered women and that he wished to elicit her expert opinion based on a hypothetical question. The following exchange then took place:

THE COURT: To what end would the hypothetical question be?

MR. HAYNES: The hypothetical question would be as to whether or not Dr. Metheeney has a professional opinion, based on her experience, her training, and her treatment of battered women, and her reading, and her attendance of seminars, as to why a woman who had

endured or experienced the hypothetical facts would stay or remain in a marital relationship where that sort of conduct went on, assuming it was true.

That issue was joined, if the Court will recall, by the persistent examination of Counsel on cross-examination of the accused, as to why she stayed.

The court then took a brief recess following which, the State's objection was sustained and Fielder was allowed to develop a bill of exception.

In developing the bill of exception, Dr. Matheeney testified concerning her experience in the treatment and counseling of abused women. Dr. Matheeney then testified that there were "many, many reasons" why women remain with men who abuse them. Counsel for appellant then posed to Dr. Matheeney a hypothetical question based on facts which ostensibly already appeared in the record to elicit the doctor's opinion as to "why a woman would stay or not leave" such a man.

In response to the hypothetical question, Dr. Matheeney recited between ten and twelve separate reasons why a woman might remain in such a relationship. Dr. Matheeney preceded her recitation of reasons with the statement that "[f]rom my experience in working with women who have been in the abusing situation, they come up with a number of reasons." Among the reasons recited were: love and a desire to stay with somebody; motivation by society to get married and stay married; a desire not to ruin the man's career (which reason she claimed had been stated to her by women that she worked with); the embarrassment of admitting to physical and sexual abuse; a feeling of helplessness on the part of the woman and an inability to make decisions; fear of reprisal if they left; a desire not to admit failure in the situation of a second marriage; the tendency to have hope and therefore forgive and forget such abuses where the man is repentant and loving between the incidents of abuse; the need to keep up appearances and not let the couples' peers know about their problems; and finally that a woman will sometimes feel that she is the property of the man therefore she is deserving and in fact responsible for the abuse inflicted upon her.

Dr. Matheeney, through further testimony, stressed the feeling of hopelessness and deterioration of self-esteem which occurs in such women. She testified concerning the misconceptions surrounding the battered woman held by laypersons and the battered woman's reluctance to inform outside persons of her situation. Fielder, at the conclusion of the bill of exception, reurged the introduction of the doctor's testimony. The trial court refused the introduction of such testimony. Following the testimony of Dr. Matheeney, the defense rested.

During Fielder's case in rebuttal, Dr. Anson Shupe, Jr., was called to testify. Dr. Shupe testified that he was an associate professor of sociology and an associate director of the center for social research at the University of Texas at Arlington. He further testified that he had done research relating to family violence and battered wives. In doing this research he had worked closely with the director of the center for social research, Dr. William Stacy. It appears that the data compiled by them had been reduced to a form which could be fed into a computer. At this point, the State objected to further testimony by Dr. Shupe as being irrelevant.

Counsel for appellant then attempted to make an offer of proof:

MR. HAYNES: Yes, Your Honor.

This witness actually has—had occasion to confront and visit with the accused in this lawsuit, for the purpose of gathering specific data and that specific data was gathered by Dr. Shupe and Dr. Stacy, from this accused, reduced to a form that the two of them have devised that permits them to do an analysis in the same fashion that a hypothetical question is put to any other expert witness. They assume that the data that they have obtained and that they put on their—in their forms and that they run through the computer, is accurate data.

They assume it's true. Once they have used the computer, they are able, then, to provide this Court and this jury with information in the form of a professional and scientific opinion concerning the degree of severity of abuse, among other things, and it is our posture that since the objection which was lodged by Counsel as against Dr. Matheeney, that is, that Dr. Matheeney had not talked to this accused, is not a viable objection in this case. Dr. Shupe has, in fact, obtained the data that he uses as a basis for his testimony, from the accused.

We're prepared to show that to the Court and to ask leave of Court to proceed.

MR. WORLEY: May I respond, Your Honor?

THE COURT: Not yet, because I'm not fully satisfied with the offer of proof. You offered a summary of conclusions you need to reach, apparently, but I still don't understand the offer of proof.

MR. HAYNES: Your Honor, the relevance, if the Court please, it is clear. Now I would hope that this is a case where the accused advances the defense of self-defense. Part of the consideration for the Court, and for the fact-finder, is the apprehension of the fear of violence, propensity of the deceased to perpetrate acts testified to and about, all going to the intent of the accused, all going to help the fact-finder in evaluating these affirmative issues from the standpoint of the accused.

THE COURT: What is this witness going to prove? That's the offer of proof that I want, Counsel. I may be—perhaps not of a receptive mind. I don't know, but nothing has got through to me, what this witness is going to prove. I asked for an offer of proof and I don't believe I've gotten what I consider to be an offer of proof.

MR. HAYNES: All right. Dr. Shupe and his colleagues have done some work that is accepted, generally, in the scientific community, where there [sic] expertise exists. This scientific work permits them their research on a data basis of 542 battered women; permits them, as mathmeticians [sic] and sociologists in that field, to assign weights of the various aspects of what they call battering. They then take and tabulate the episodes, assumed to be true, run them through the computer with these assigned weights and come out with a percentile that has a data base to it that makes it a reliable percentile.

THE COURT: A percentile of what, Counsel?

MR. HAYNES: Severity of the battering on the part of the batterer. If I might narrow—and perhaps we can clear that up with a few questions from Dr. Shupe.

THE COURT: You may ask your questions before I rule on the State's objection. You may proceed with voir dire, Counsel.

During voir dire examination, Dr. Shupe testified that his research included the study of over 542 women who had been abused. Dr. Shupe described the manner in which information was gathered from these women. He then related how this information was reduced to a form of data which could be fed into a computer. Dr. Shupe described a form or questionnaire which had been developed to aid in reducing the information gathered into a form compatible with data processing procedures.

It appears that Fielder filled out one of these questionnaires. The information on Fielder's questionnaire was then fed into the computer. Dr. Shupe testified concerning the procedure that was used to analyze this information and then related the results obtained from Fielder's completed questionnaire. He testified that according to the form which Fielder filled out, she received 57 points out of a possible 59. Dr. Shupe then testified that "[i]f she [Fielder] would have been slapped, she would have gotten 59 points."

At the end of the voir dire examination, the testimony of Dr. Shupe was again of-

fered for admission. The trial court responded:

> THE COURT: The Court has listened carefully to the offer of proof in the voir dire. The Court has undertaken, diligently, to relate the presentation to either the question of whether or not this Defendant, knowingly and intentionally killed Darwin Fielder by shooting him with a gun or to the issue of whether or not this Defendant did such an act protecting herself under the applicable Texas rules known as the law of self-defense, and this Court finds that the offer of proof shows no relevance to the issues before this Court and I will grant the State's objection and oral motion to suppress....

Fielder called Dr. William Stacy as her next witness. Dr. Stacy is a mathematical sociologist and the colleague of Dr. Shupe. Dr. Stacy was questioned concerning the questionnaire filled out by Fielder. The State then objected to further testimony by the witness as being irrelevant. After determining that Dr. Stacy had worked in conjunction with Dr. Shupe in analyzing Fielder's questionnaire, the trial court sustained the State's objection.

Fielder contends that the proffered testimony of the three expert witnesses was admissible pursuant to TEX.PENAL CODE ANN. sec. 19.06 (Vernon 1976). She argues that the testimony met the test for admissibility set out in *Hopkins v. State,* 480 S.W.2d 212 (Tex.Crim.App.1972). Fielder asserts that such expert testimony would have aided the jury in comprehending the facts of the case and was relevant to the issue of self-defense. In furtherance of her argument, she urges this court to adopt the position taken by those courts which have accepted similar evidence as admissible and relevant, citing *Ibn-Tamas v. United States,* 407 A.2d 626 (D.C.App. 1979) and *Smith v. State,* 277 S.E.2d 678 (Ga.1981).

Initially we note that the issue before this court is one of first impression. The courts of this state have never before written on the issue of admissibility of expert testimony on the battered woman syndrome. We therefore will review the battered woman syndrome and the decisions of those courts which have directly dealt with its admissibility.

Recognition of the phenomenon known as the battered woman syndrome is based on a growing body of knowledge dealing with the plight of women who suffer abuse and violence at the hands of their mates and can be summarized in the following discussion. The term "mate", as used in this context, describes the woman's batterer and may be a husband, boyfriend or lover. This battering behavior tends to occur in distinct and repetitive stages or cycles which will vary in intensity from case to case but the end result is the same, a battered woman.

A battered woman displays and suffers from certain common characteristics. Most all of these women, for one reason or another, either accept their situation or become unable to take action to stop the battering or escape their plight. For whatever the reasons, these women find themselves in an abusive relationship from which they do not act to escape. These women often either refuse, or find themselves unable, to seek help from outside sources whether it be friends, family, or law enforcement authorities.

Some of these women do, however, seek help and it is those women who have contributed the most to our understanding of the psychological phenomenon called the battered woman's syndrome. A few of the women who unfortunately do not seek outside help, instead take matters into their own hands. These women, in attempts to extricate themselves from the situation by disposing of their batterers, become subject to the criminal laws of our states.

The battered woman experiences feelings of anxiety, self-blame, isolation and fear. She lives in a state of fear; the constant fear of being subjected to further violence by her batterer. When and if the battered woman strikes back at her batterer, often killing him, it usually occurs in one of two situations: 1) in direct response to provoca-

tion or aggression by the batterer; or 2) pursuant to no direct provocation, but out of a desire to be free from the situation and safe from her tormentor. In both situations, it can fairly be said that the battered woman perceives herself as acting in self-defense. Where the defendant acts in the absence of provocation it is obvious that testimony on the battered woman syndrome would be relevant to show the reasonableness of the defendant's fears and of her perceptions that such acts were necessary to protect herself under the circumstances. In the first situation, however, where the defendant acts in direct response to physical aggression by the batterer, the necessity of such testimony becomes more attenuated to the issue of the reasonableness of her fears as the extent and intensity of provocation increases. As the level of the attack by the deceased batterer increases in intensity, the reasonableness of the defendant's fears becomes more obvious to the trier of fact.

In *Ibn-Tamas*, the defendant had shot and killed her husband. The defendant claimed that she had acted in self-defense. At trial, the defense proffered the testimony of a clinical psychologist who had examined the defendant, as a defense expert on the subject of battered women, which testimony was excluded by the trial court. The witness would have also testified that "Mrs. Ibn-Tamas was a 'classic case' of the battered wife." *Ibn-Tamas*, 407 A.2d at 634. The *Ibn-Tamas* court applied a three part test to determine admissibility of the expert testimony:

(1) the subject matter "must be so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman"; (2) "the witness must have sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference will probably aid the

trier in his search for truth"; and (3) expert testimony is inadmissible if "the state of the pertinent art or scientific knowledge does not permit a reasonable opinion to be asserted even by an expert."

*Id.* at 632–633 [Citations omitted.] In applying this test, the court found that the subject matter of the proffered testimony was in fact beyond the ken of the average layman in that such testimony "would have supplied an interpretation of the facts which differed from the ordinary lay perception advocated by the government." *Id.* at 634–635. It was additionally found that such testimony was highly probative[2] in that the defendant's "identity as a 'battered wife', *if established*, may have had a substantial bearing on her perceptions and behavior at the time of the killing." *Id.* at 639. [Emphasis added.] The court further found "as a matter of law, that the probative value of this expert testimony would outweigh the risk" of prejudice. *Id.* at 639. Upon remand for a trial court determination of admissibility, under the second and third parts of the test for admissibility, the trial court found that the "defendant failed to establish a general acceptance by the expert's colleagues of the methodology used in the expert's study of 'battered women'", which finding was upheld on appeal. *Ibn-Tamas v. United States*, 455 A.2d 893, 894 (D.C.App.1983).

In *Smith v. State*, the defendant shot and killed her boyfriend. She claimed that she had acted in self-defense. The defendant gave uncorroborated testimony on instances of physical abuse she suffered at the hands of her boyfriend. The defense called a clinical psychologist, who had examined the defendant, to testify concerning the battered woman syndrome and that "in her professional opinion the defendant fell within the battered woman profile and had the typical battered woman's syndrome."

**2.** The court found that the psychologist's testimony would have served at least "two functions: (1) it would have enhanced Mrs. Ibn-Tamas' general credibility in responding to cross-examination designed to show that her testimony about the relationship with her husband was

implausible; and (2) it would have supported her testimony that on the day of the shooting her husband's actions had provoked a state of fear which led her to believe she was in imminent danger ... and thus responded in self-defense." *Ibn-Tamas*, 407 A.2d at 634.

*Smith,* 277 S.E.2d at 680. The expert testimony was excluded by the trial court. The court in *Smith,* reversed the conviction finding that "the expert's testimony explaining why a person suffering from battered woman's syndrome would not leave her mate, would not inform police or friends, and would fear increased aggression against herself, would be such conclusions that jurors could not ordinarily draw for themselves." *Id.* at 683. *See Mullis v. State,* 282 S.E.2d 334, 337 (Ga.1981), holding that it *was not error* to exclude expert testimony on the battered woman syndrome "where the testimony sought to be admitted related to the reasonable fears of a defendant which could be comprehended by the average juror and does not meet the test in *Smith,* that it relate to evidence difficult for the average juror to comprehend"; and *Strong v. State,* 307 S.E.2d 912 (Ga.1983).

The Supreme Court of New Jersey in *State v. Kelly,* 478 A.2d 364 (N.J.1984), held that expert testimony on the battered woman syndrome is "relevant to the reasonableness of defendant's belief that she was in imminent danger of death or serious injury." *Id.* at 377. Such testimony was held admissible to help explain the defendant's state of mind and to rebut the general misconceptions regarding battered women.

The Supreme Judicial Court of Maine in *State v. Anaya,* 438 A.2d 892 (Me.1981), found that expert testimony on the battered wife syndrome would have been highly probative and more helpful than confusing to the jury. It was also found that the evidence "would have given the jury reason to believe that the defendant's conduct was, contrary to the State's assertions, consistent with her theory of self-defense." *Id.* at 894. The court held that "where the psychologist is qualified to testify about the battered wife syndrome, *and the defendant establishes her identity as a battered woman,* expert evidence on the battered wife syndrome must be admitted." *Id.* at 894. [Emphasis added.]

The appeals court in *Hawthorne v. State,* 408 So.2d 801, 807 (Fla.Dist.Ct.App.1982), found that expert testimony on the battered woman syndrome was improperly excluded by the trial court and stated:

Appellant did not seek to show through the expert testimony that the mental and physical mistreatment of her affected her mental state so that she could not be responsible for her actions; rather, the testimony would be offered to show that because she suffered from the syndrome, it was reasonable for her to have remained in the home and, at the pertinent time, to have believed that her life and the lives of her children were in imminent danger. It is precisely because a jury would not understand why appellant would remain in the environment that the expert testimony would have aided them in evaluating the case.

The Supreme Court of Washington in *State v. Allery,* 682 P.2d 312 (Wash.1984), found that expert testimony on the battered woman syndrome should have been admitted at trial and stated:

We find that expert testimony explaining why a person suffering from the battered woman syndrome would not leave her mate, would not inform police or friends, and would fear increased aggression against herself would be helpful to a jury in understanding a phenomenon not within the competence of an ordinary lay person. Where the phychologist is qualified to testify about the battered woman syndrome, *and the defendant establishes her identity as a battered woman* expert testimony on the battered woman syndrome is admissible.

*Id.* at 316 (citations omitted) (emphasis added). *See State v. Kelly,* 655 P.2d 1202 (Wash.App.1982), *rev'd,* 685 P.2d 564 (Wash.1984).

The Supreme Court of Wyoming in *Buhrle v. State,* 627 P.2d 1374, 1378 (Wyo. 1981), upheld the trial court's exclusion of expert testimony [3] on the battered woman syndrome by stating:

---

**3.** The expert testimony of Dr. Lenore E. Walker

was offered at trial. The court states that "she

In our holding here we are not saying that this type of expert testimony is not admissible; we are merely holding that the state of the art was not adequately demonstrated to the court, and because of inadequate foundation the proposed opinions would not aid the jury.

See *Jahnke v. State*, 682 P.2d 991, 996 (Wyo.1984), where the Supreme Court of Wyoming characterized the use of such evidence in a homicide case as an effort on behalf of a defendant "to secure the recognition of a special defense" and an attempt "to establish the concept that one who is a victim of family abuse is justified in killing the abuser."

The decisions of other courts have also impliedly held such evidence to be admissible. In *State v. Leidholm*, 334 N.W.2d 811, 819 (N.D.1983), testimony on the battered woman syndrome was admitted at trial but, the Supreme Court of North Dakota upheld the trial court's refusal of a proposed instruction on the battered woman syndrome. In both *Fultz v. State*, 439 N.E.2d 659, 662 (Ind.App.1982), and *State v. Martin*, 666 S.W.2d 895, 899 (Mo.App. 1984), exclusion of testimony on the battered woman syndrome was upheld because the defendants failed to make a prima facie showing that they had acted in self-defense. The court in *People v. Powell*, 102 Misc.2d 775, 424 N.Y.S.2d 626, 632 (N.Y.Co.Ct.1980), found that testimony on the battered woman syndrome did not constitute such new evidence as would require a setting aside of the judgment of conviction. The defendant in *People v. Minnis*, 118 Ill.App.3d 345, 74 Ill.Dec. 179, 455 N.E.2d 209 ([14th Dist.] 1983), raised the issue of self-defense but, offered testimony on the battered woman syndrome to aid in her explanation of why she dismembered the body of her husband. The appeals court held that such testimony was relevant to the issue of why she dismembered

the body. *Id.* Ill.Dec. at 188, 455 N.E.2d at 218.

The State of Ohio has, however, found such testimony to be absolutely inadmissible. In *State v. Thomas*, 66 Ohio St.2d 518, 423 N.E.2d 137 (1981), the defendant was charged with the shooting death of her common-law husband and at trial she raised the theory of self-defense. The defense offered expert testimony on battered wives which was excluded by the trial court. The Supreme Court of Ohio upheld such exclusion finding:

Expert testimony on the "battered wife syndrome" by a psychiatric social worker to support defendant's claim of self-defense is inadmissible herein because (1) it is irrelevant and immaterial to the issue of whether defendant acted in self-defense at the time of the shooting; (2) the subject of the expert testimony is within the understanding of the jury; (3) the "battered wife syndrome" is not sufficiently developed, as a matter of commonly accepted scientific knowledge, to warrant testimony under the guise of expertise; and (4) its prejudicial impact outweighs its probative value.

*Id.* 423 N.E.2d at 140. The court prefaced this finding by stating:

Our conclusion would remain the same even if defendant's expert had personally interviewed defendant before being offered as a witness, even if defendant had conclusively established that defendant was, in fact, a battered wife, and even if defense counsel had propounded a hypothetical question to defendant's expert witness.

*Id.* 423 N.E.2d at 139. The defendant sought a writ of habeas corpus in Federal Court for post conviction relief. *Thomas v. Arn*, 728 F.2d 813 (6th Cir.1984). Relief was refused because Thomas waived her right to appeal. However, in a concurring opinion, Judge Nathaniel R. Jones states; "[i]n my opinion the expert testimony could

---

is the pioneer in the field of the so-called 'battered woman syndrome'. By her own characterization she is the foremost authority on that phenomenon." *Buhrle*, 627 P.2d at 1376 [Footnotes omitted.] Dr. Walker was the expert who

testified for the defense in *Ibn-Tamas*, and *Hawthorne*. Her testimony was also offered in *State v. Martin*, 666 S.W.2d 895 (Mo.App.1984), and *People v. Powell*, 102 Misc.2d 775, 424 N.Y.S.2d 626 (Co.Ct.1980).

have clarified the unique psychological state of mind of the battered woman and should have been admitted by the trial judge." *Id.* at 815.

Fielder initially claims that the proffered expert testimony is admissible pursuant to TEX.PENAL CODE ANN. sec. 19.06 (Vernon 1974). Section 19.06 provides:

In all prosecutions for murder or voluntary manslaughter, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

In *McClure v. State*, 575 S.W.2d 564, 567 (Tex.Crim.App.1979), the Court of Criminal Appeals held that expert opinion testimony by a psychiatrist was admissible pursuant to "V.T.C.A., Penal Code, sec. 19.06, as going to show appellant's state of mind at the time of the offense." We, however, find that the excluded testimony in the present case is distinguishable from that presented in *McClure*.

The psychiatrist in *McClure*, was appointed by the court to examine the appellant. *Id.* at 565. From his examination of the appellant and a review of the facts of the case, the psychiatrist would have testified to the appellant's overall mental state and specifically would have given his expert opinion as to the appellant's state of mind at the time of the offense. *Id.* at 566. In the present case, Dr. Matheeney never examined Fielder and never reviewed the facts of the case. Instead, Dr. Matheeney was asked to render her opinion, based on a hypothetical question, as to why a woman would remain in a battering relationship. Dr. Matheeney's opinion in this respect was only a recitation of the several reasons why a woman might remain in a battering relationship. Dr. Matheeney was incapable of rendering an opinion on Fielder's mental state that existed either at trial or at the time of the shooting. In addition, Dr.

Shupe and Dr. Stacy are sociologists and as such were not competent to render an opinion on Fielder's mental state. Further, the very reliability of the information which they were privy to concerning Fielder was highly questionable, which fact will be developed further at a later point.

The fact that Dr. Matheeney never examined Fielder and never reviewed the facts of the case renders her testimony distinguishable from the expert testimony excluded in *McClure*. Because Dr. Matheeney was incapable of rendering an opinion as to Fielder's mental state, her testimony was not admissible under sec. 19.06. We hold that due to both the questionable reliability of the information available to Dr. Shupe and Dr. Stacy and the fact that they were not competent to render an opinion as to Fielder's mental state, their testimony was not admissible under sec. 19.06.

Fielder argues nevertheless, that Dr. Matheeney's testimony was relevant to her defense. A review of those cases where testimony on the battered woman syndrome has been held admissible, reveals two levels of inquiry used by sister states to determine admissibility. First, the relevance of such testimony to some issue before the trier of fact must be established. Secondly, the expert testimony must satisfy the requirements of admissibility as would be applied to any other form of expert medical or scientific testimony.

In addressing the question of relevancy, those courts which have admitted expert testimony on the battered woman syndrome have done so for two reasons. First, to dispel alleged common misconceptions usually held by a jury that a normal or reasonable person would not remain in such an abusive relationship. *See Ibn-Tamas*, 407 A.2d at 634; *Smith*, 277 S.E.2d at 683; *State v. Kelly*, 478 A.2d at 378; *State v. Anaya*, 438 A.2d at 894; *Hawthorne*, 408 So.2d at 807; and *State v. Allery*, 682 P.2d at 316. In effect, such testimony is admitted for the specific purpose of bolstering the defendant's testimony and to lend credibility to her version of the facts. Secondly, such testimony is admitted to

show the reasonableness of the defendant's fears that she was in imminent peril of suffering death or serious bodily injury. *See Ibn-Tamas*, 407 A.2d at 634; *Smith*, 277 S.E.2d at 683; *State v. Kelly*, 478 A.2d at 377; *State v. Anaya*, 438 A.2d at 894; *Hawthorne*, 408 So.2d at 807; and *State v. Allery*, 682 P.2d at 316. Admissibility, in this context, appears to be based on the fact that the average person subjected to the same facts and circumstances surrounding the incident might not fear for his or her life or physical well being. The defendant, however, because she is a battered woman, harbors such a fear and arguably acts excessively in her defense.

In Fielder's offer of proof, it was stated that Dr. Matheeney's testimony was offered solely for the purpose of showing why a woman would remain and endure such a relationship. Such testimony was offered to show why Fielder had not sought to escape previously from her allegedly abusive relationship with her husband. For the reasons hereinafter stated, we find that the proffered testimony of Dr. Matheeney was not relevant to any issue before the jury.

TEX.PENAL CODE ANN. sec. 9.31(a) (Vernon 1974), this state's self-defense statute, provides that, "a person is justified in using force against another when and to the degree *he reasonably believes* the force is immediately necessary to protect himself ...". [Emphasis added.] Then, TEX.PENAL CODE ANN. sec. 9.32(3) (Vernon 1974), provides that, "[a] person is justified in using deadly force against another ... when and to the degree *he reasonably believes* the deadly force is immediately necessary ...". [Emphasis added.] Both of these statutory subsections set out a subjective standard of reasonableness. The defendant's state of mind at the time of the incident is therefore, the controlling factor. The question becomes, whether or not the defendant reasonably believed that the use of deadly force was necessary.

A person's use of deadly force is limited by the application of sec. 9.32(2) which states that "[a] person is justified in using deadly force against another: ... if *a reasonable person in the actor's situation would not have retreated;* ..." [Emphasis added.] This subsection sets out an "objective" standard and not a subjective standard. The question is not whether the defendant would not have retreated, but whether or not "a reasonable person" in the same situation would not have retreated. *See Semaire v. State*, 612 S.W.2d 528, 532 (Tex.Crim.App.1981) (Douglas, J., dissenting) (McCormick, J., dissenting); and *Dyson v. State*, 654 S.W.2d 577, 579 (Tex. App.—Fort Worth 1983), *aff'd*, 672 S.W.2d 460 (Tex.Crim.App.1984). The statute requires that the defendant retreat, if he can do so safely, before taking human life. *See* Searcy III and Patterson, *Practice Commentary on Deadly Force in Defense of Person*, 1 TEX.PENAL CODE ANN. 346, 348 (Vernon 1974); and *Valentine v. State*, 587 S.W.2d 399, 402 (Tex.Crim.App. 1979). The obligation to retreat arises at the time it becomes necessary for the defendant to use deadly force and requires retreat from the *immediate situation*, if possible. *See Sternlight v. State*, 540 S.W.2d 704, 706 (Tex.Crim.App.1976); and *Young v. State*, 530 S.W.2d 120, 123 (Tex. Crim.App.1975).

This statutory duty, that a reasonable person in the actor's situation must retreat if at all possible, makes the issue of an appellant's failure to leave an abusive relationship *prior* to the incident irrelevant to any issue before the trier of fact. Fielder's existence in an abusive relationship and her reasons for remaining in such a relationship are not issues raised by her claim of self-defense under the statute. It is not relevant why she remained in an abusive relationship. What is relevant is whether or not a reasonable person would have retreated at the immediate time of the incident in question. *Cf. State v. Kelly*, 478 A.2d at 375 n. 10. The very essence of the admissibility of testimony on the battered woman's syndrome is predicated on the assertion that a battered woman does not react to outside stimulus in the same

way that a reasonable person would react; *i.e.* that the perceptions of a battered woman are different from those of a reasonable person. Under the facts of this case, Fielder's reasons for remaining in an abusive relationship and her reasons for failing to leave are not relevant to her particular claim of self-defense.

Based on the hypothetical question, Dr. Matheeney recited numerous reasons why a woman might remain in an abusive relationship. Although each of these reasons dealt with some aspect of the stated hypothetical question, none showed a need to act in self-defense by using deadly force. Only the reason of "fear of reprisal" dealt with Fielder's stated reasons for not leaving her relationship.

During redirect examination of Fielder, counsel for appellant asked her why she had not left the relationship to which Fielder responded:

> Darwin told me that he would severely punish me. He told me, on occasions, he would kill me. He told me that there wasn't anything or any place on this earth that I could ever get away so that he wouldn't be able to find me. And I believed him.

Prior to this time, the State had never inquired into Fielder's reasons for failing to leave the relationship and Fielder had never articulated any such reasons. On re-cross-examination, the following exchange took place:

[By the State]

Q. Well, tell me, did you not leave Darwin Fielder because you were afraid he would search to the ends of the world and find you as you testified, or that— because you loved him, which one was it?

A. If it came down to a choice between the two, I didn't leave him because I was frightened.

■■■ We find, under the facts of the present case, that Fielder's stated reason for not leaving her marital relationship was a matter within the comprehension of the average juror. It is not outside the average juror's comprehension that a person can be coerced to act or fail to act when threatened with death or serious bodily injury. We find that the exclusion of Dr. Matheeney's expert testimony in this respect, if error at all, amounted to no more than harmless error.

Fielder's testimony as to what happened the night of the shooting can be summarized in this manner. Fielder testified that on that night she told her husband, the deceased, Darwin Fielder, that she had gone the day before to see an attorney about getting a divorce. Upon hearing this Darwin became furious and immediately headed towards the cave.[4] At this point, she became very frightened and headed for the door to go outside. Before she reached the door, Darwin caught her and pushed her back into the living room. Darwin then went to a cabinet over the bar area and got the gun which was always kept there, loaded. Darwin was screaming at her "I've told you, I've told you." She testified that she understood this to mean that he had told her that he would kill her if she ever revealed their sexual activities to anyone. She testified further that she knew he was going to kill her. Darwin then sat down on the edge of a chair and placed the gun on a nearby table. Pamela Fielder immediately grabbed the gun and told Darwin to "leave me alone". Darwin then came at her and she shot him several times.

**4.** At trial, a great deal of Fielder's testimony was spent developing the appellant's and her husband's sexual activities and their use of what they both referred to as the *cave*. The cave, it appears, was a utility closet in which was kept numerous devices and paraphernalia which the couple used in their sexual activities. Fielder testified that, at the direction of her attorney, who was to handle her divorce, she placed all of these items in plastic bags on the morning of July 23, 1981. She did this in order to eventually transport the items to her attorney's office, however, after bagging them up, she left the bags in the cave. Fielder had previously testified that Darwin had told her that if she ever revealed their sexual activities to anyone that he would kill her.

The above testimony by Fielder, if believed by the jury, was more than adequate to satisfy the requirements of the self-defense statute of this state. Fielder's testimony alleges that Darwin threatened her with the unlawful use of deadly force. Her testimony alleges that she not only thought it reasonable to retreat but in fact attempted to retreat, and was not allowed to. Fielder testified that she perceived herself as being in a position of imminent danger of death. She therefore, picked up the gun and shot him, before he could do so to her. If the jury had believed her account of the incident, the evidence would have supported a finding that she acted in self-defense and a verdict of not guilty. It is not outside the comprehension of the average juror that a woman might fear imminent death or serious bodily injury at the hands of a man whose professional career and life she had threatened to destroy, and with whom she had lived in a violent and abusive relationship, and who had just pulled a gun on her.

We find, under the facts of the present case, that the reasonableness of Fielder's fear of suffering death or serious bodily injury was a matter within the comprehension of the average juror. We find that the exclusion of Dr. Matheeney's expert testimony, if error at all, again amounted to no more than harmless error.

■ We turn now to determine the relevancy of the testimony offered by Dr. Shupe and Dr. Stacy. Dr. Shupe's testimony concerning the analysis of the questionnaire which Fielder filled out, would have done nothing more than establish the severity of the batterings allegedly suffered by Fielder at the hands of her husband and how such batterings compared to those of other women who had responded to the questionnaire. The severity of the batterings, if any, suffered by Fielder was not an issue in the present case. There was ample sordid testimony presented to the jury concerning the parties' relationship. We find that the jury, without the aid of expert testimony, could determine for itself the severity of the alleged batterings suffered by Fielder.

The introduction of such testimony would have done nothing more than confuse the issues that were properly before the jury. Such testimony had no probative value. Fielder's offer of proof completely failed to reveal whether or how the offered study had been tested for the accuracy or truthfulness of the information that was gathered. There was no showing of any type of control group used, any "norms" to go by, or that any research was done to verify the actual existence of any fact contained in the study. Counsel for the appellant in the offer of proof admitted that the doctors merely "assumed" that the information and data which they gathered was accurate and true. The study appears to be nothing more than a statistical analysis of various unsubstantiated battering incidents. We find that such testimony was totally irrelevant to any issue before the jury. We find no abuse of discretion in excluding such testimony and that the error, if any exists, in excluding such testimony was harmless.

■ Although we have found that under the facts of the present case, the exclusion of the proffered testimony of Dr. Matheeney and the sociologists was at most harmless error, there is another reason why such exclusion was not error. In *Ibn-Tamas*, the court recognized that the probative value of testimony on the battered woman's syndrome must outweigh its prejudicial impact. *Ibn-Tamas*, 407 A.2d at 639. The court therefore, impliedly required that the defendant must establish herself as a battered woman by stating: "Because Mrs. Ibn-Tamas' *identity as a 'battered wife', if established,* may have had a substantial bearing on her perceptions and behavior at the time of the killing, it was central to her claim of self-defense." *Id.* [Emphasis added.] In every case, without exception, where such testimony has been held admissible, the identity of the defendant as a battered woman was required and would have been established by expert testimony. *See Ibn-Tamas*, 407 A.2d at 634; *Smith*, 277 S.E.2d at 680;

*State v. Kelly,* 478 A.2d at 373; *State v. Anaya,* 438 A.2d at 894; *Hawthorne,* 408 So.2d at 807; and *State v. Allery,* 682 P.2d at 315. In *State v. Anaya,* and *State v. Allery,* the courts emphasize that the defendant must establish her identity as a battered woman before such testimony will be admissible. *State v. Anaya,* 438 A.2d at 894; *State v. Allery,* 682 P.2d at 316.

The inescapable corollary to the defendant's identity as a battered woman is the deceased's identity as a batterer. This fact in itself would be extremely inflammatory to an impressionable jury. Hearing such testimony, the jury becomes more inclined to lend a sympathetic ear to the defendant's *version* of the facts and this is one of the very reasons articulated by the courts for admitting such testimony. *See Ibn-Tamas,* 407 A.2d at 634; *State v. Kelly,* 478 A.2d at 375; and *State v. Anaya,* 438 A.2d at 894.

The testimony has been held admissible, however, because its probative value outweighs its prejudicial impact. If the defendant's identity as a battered woman is not established however, all probative value is negated and testimony on the battered woman's syndrome would be nothing more than prejudicial. The very introduction of such testimony where the defendant has not been established as a battered woman would lead a jury to the inescapable inference that the deceased was in fact a batterer. This inference, gleaned from such testimony, would merely confuse the issue before the trier of fact and result in undue prejudice.

We hold that if the defendant does not establish herself as a battered woman by competent direct expert testimony, then the probative value of any testimony on the battered woman syndrome is completely negated leaving only the testimony's potential for prejudice. In reviewing both Fielder's offer of proof and the voir dire examination of Dr. Matheeney, at no point does the witness either state that Fielder is a battered woman or that the hypothetical question represents the situation or actual existence of any battered woman. In fact,

Dr. Matheeney never interviewed Fielder and never reviewed the facts of the case. In addition, neither the testimony of Dr. Shupe nor Dr. Stacy would have established Fielder as a battered woman. Though both sociologists came in contact with Fielder when she filled out their questionnaire, it does not appear that they examined her. Further, Fielder failed to prove that the sociologists had either scientific or medical competency to render any opinion as to her existence as a battered woman.

The probative value of expert testimony on the battered woman syndrome squarely rests on the *assumption* that this is a body of scientific knowledge and therefore beyond the ken of the average layman. A natural corollary therefore is that the average layman would not be able to recognize or identify a battered woman, nor be able to define the characteristics of a battered woman. In the present case, Dr. Matheeney neither identified Fielder as a battered woman nor did she offer a definition or the distinguishing characteristics of a battered woman. The entire issue of why a certain group of women should have their conduct viewed differently than the body politic carries with it the necessity that a defendant identify herself as a member of such a group. In the absence of such identity, we feel that the trial court was completely justified in excluding all of the proffered testimony. It is well settled that the trial court's decision to admit or exclude proposed opinion testimony will not be disturbed unless a clear abuse of discretion is shown. *See Steve v. State,* 614 S.W.2d 137, 139 (Tex.Crim.App.1981) and *Williams v. State,* 535 S.W.2d 637, 639 (Tex.Crim.App. 1976). The issue of relevancy is also a matter which falls within the sound discretion of the trial court. *See Stone v. State,* 574 S.W.2d 85, 89 (Tex.Crim.App.1978).

We find that Fielder's failure to establish herself as a battered woman by direct expert testimony rendered the testimony of Dr. Matheeney, Dr. Shupe and Dr. Stacy irrelevant to any issue before the jury. We are not finding on the admissibility of such

evidence otherwise. We find no abuse of discretion in the trial court's exclusion of such testimony. Fielder's ground of error three is overruled.

The conviction of the appellant is affirmed.